UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TRUVERIS, INC., | ) | CASE NO.  1:21-cv-01262 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BRIDGET M. BRENNAN |
| v. | ) | |
| | ) | |
| SKYSAIL CONCEPTS, LLC., | ) | **MEMORANDUM OPINION** |
| d/b/a SKYSAIL RX, LLC | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

Truveris, Inc. ("Plaintiff" or "Truveris") filed a civil complaint in this Court against SkySail

Concepts, LLC *d/b/a* SkySail RX, LLC ("Defendant" or "SkySail") asserting one count of patent

infringement.  (Doc. No. 1. ¶¶ 1-3.)[1]

SkySail moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief may be granted.  (Doc. No. 13.)  The motion asserts that

the patent upon which Truveris filed suit is directed to ineligible subject-matter and therefore is

invalid as a matter of law.  (*See id.*)  Plaintiff filed an opposition to SkySail's motion.  (Doc. No.

21.)  SkySail filed a reply.  (Doc. No. 24.)

### Facts Alleged in the Complaint

Many employers, government units, labor unions, and other entities sponsor a prescription

drug benefit plan for their employees or members.  (Doc. No. 1 ¶¶ 12, 14, 16, 21.)  Such plans

are offered and administered by pharmacy benefit managers ("PBMs").  (*Id.* ¶¶ 12-14, 21.)

---

[1] This case arises under federal patent statutes, 35 U.S.C. § 100 *et seq.*, and so this Court has
subject-matter jurisdiction under 28 U.S.C. § 1331.

Choosing among PBMs and their respective plans is a major decision given the substantial

cost of providing prescription drug coverage.  (*E.g., id.* ¶¶ 15-17 (recounting a state saving

billions of dollars by selecting a new PBM and plan).)  Selecting among drug benefit plans is not

only consequential, it also can be complicated, given the volume of data and the pricing practices

of pharmaceutical companies and PBMs.  (*See* Doc. No. 1-1 PageID# 43 1:29-2:8.)

The litigants here, Truveris and SkySail, are competitors.  (Doc. No. 1 ¶¶ 1, 12, 19-22.)

Both offer consultation and other services to entities and employers who are in the market for a

new prescription drug plan.  (*Id.* ¶¶ 12-18, 19-25.)  Truveris and SkySail may be retained by

those plan sponsors to help solicit and evaluate plan bids from PBMs.  (*Id.* ¶¶ 14-17, 22-24.)

Truveris describes itself as digital health company that helps its customers reduce spending

on prescription drugs.  (*Id.* ¶¶ 12-13.)  The complaint refers to a "proprietary data-driven cloud-

based platform," by which Truveris "aggregates data and insights spanning the pharmacy market

place."  (*Id.*)  Truveris' complaint boasts software branded TruBid®.  (*Id.* ¶¶ 12-18; *see also*

Doc. No. 1-7.)

Truveris owns U.S. Patent No. 10,817,920 ("the '920 Patent").  (*Id.* ¶¶ 8-10.)  Truveris

alleges and admits: "The '920 Patent is generally directed to 'electronic management of a request

for proposal (RFP) and corresponding bids for selecting a prescription drug plan.'"  (*Id.* ¶ 11,

*quoting* Doc. No. 1-1[2] at 1:16-18.)  The patent's abstract refers to:

> A system and method for managing selection of a prescription drug plan, based on
> generating a request for proposal (RFP), submitting the RFP to prescription benefit
> management (PBM) vendors, receiving bids from PBM vendors, and calculating
> weighted scores of the bids to determine total score for the plan.

---

[2] Exhibit 1 to the complaint, (Doc. No. 1-1), is an official copy of the '920 Patent and will be
cited, *infra.*, as the '920 Patent.

('920 Patent at Abstract (57).)  "Embodiments of the invention relate generally to prescription drug plans and, more specifically, to electronic management of a request for proposal (RFP) and corresponding bids for selecting a prescription drug plan."  (*Id.* 1:13-18; *see also id.* 2:64-67 ("Embodiments of the invention provide methods for managing selection of prescription drug plans.".)

Claim 1 of the '920 Patent lays out a fifteen (15) step computer-implemented method "for supporting an entity with selection of a prescription drug plan."  (Doc. No. 1-1 PageID# 47 at 9:17-19.)  The text of Claim 1 is reproduced below, to which the Court has added for reference purposes bracketed letter designations for each of the elements:

> 1.  A computer-implemented method performed by a computer system for supporting an entity with selection of a prescription drug plan, said method comprising:
>
> **[1-A]**  receiving a request to initiate a request for proposal (RFP) process from a particular remote client system of a plurality of remote client systems, the request to initiate the RFP process being for a prescription drug plan for a particular entity;
>
> **[1-B]**  obtaining a particular set of historical drug claims for the particular entity from a remote database;
>
> **[1-C]**  generating an RFP for the particular entity for the prescription drug plan based on the particular set of historical drug claims obtained from the remote database;
>
> **[1-D]**  distributing said RFP to a plurality of remote pharmacy benefit manager (PBM) systems to participate in submission of a bid in response to said RFP;
>
> **[1-E]**  receiving an electronic confirmation from one or more of said plurality of remote PBM systems acknowledging participation in said RFP;
>
> **[1-F]**  receiving one or more bids containing pricing information and contract terms from the one or more of said plurality of remote PBM systems having acknowledged participation, the pricing information comprising respective pricing terms corresponding to one or more drug claims, the one or more bids each including a corresponding PBM-indicated drug classification for each drug claim of the one or more drug claims;

**[1-G]**  obtaining, from one or more third party systems, data indicators indicating third-party-indicated drug classifications for the historical drug claims of the particular set of historical drug claims, the third-party-indicated drug classifications including a generic drug classification, a brand drug classification, and a specialty drug classification, the third party systems being different than the remote database, the particular remote client system and the plurality of PBM systems;

**[1-H]**  classifying each historical drug claim of the particular set of historical drug claims into one or more third-party-indicated drug classifications of the third-party-indicated drug classifications based on the data indicators, the classifying disregarding the corresponding PBM-indicated drug classification;

**[1-I]**  obtaining, from the one or more third-party systems, price inflation parameters and utilization inflation parameters for each third-party-indicated drug classification of the one or more third-party-indicated drug classifications;

**[1-J]**  obtaining historical utilization data associated with the particular set of historical drug claims;

**[1-K]**  using the particular set of historical drug claims from the remote database to project costs forward by applying the price inflation parameters to the pricing information of each bid of said one or more bids based on the one or more third-party-indicated drug classifications, and applying the utilization inflation parameters to the historical utilization data associated with the particular set of historical drug claims;

**[1-L]**  calculating a corresponding estimated plan cost for each bid of the one or more bids based on the projecting costs forward, the corresponding estimated plan cost of each bid of the one or more bids having accounted for price inflation and utilization inflation based on the same price inflation parameters, the same utilization inflation parameters, and the same third-party-indicated drug classifications;

**[1-M]**  calculating a contract terms cost for the contract terms of each bid of the one or more bids;

**[1-N]**  generating scores for each bid of said one or more bids based on the corresponding estimated plan cost and on the contract terms cost; and

**[1-O]**  sending at least one bid of the one or more bids and at least one score of the scores to said particular remote client system to support selection of the drug prescription plan from the one or more bids.

('920 Patent 9:16-10:24.)  The Court will refer to these letter designations when discussing the individual elements, *infra.*

Although the claim elements use verbs that might seem like tasks performed manually or on paper, Truveris clarified that—

> throughout the description, discussions utilizing terms such 'initiating', 'receiving', 'determining', 'generating', 'constructing', 'transmitting', 'adjudicating', 'scoring', 'calculating', 'processing', 'presenting' or the like, *refer to the action and processes of a computer system*….

('920 Patent 3:28-32, emphasis added.)

The '920 Patent acknowledged that employers who sponsor prescription drug coverage plans commonly put out a solicitation for bids from PBM vendors:

> Presently, sponsors of pharmacy benefit management plans *typically* enter into a request for proposal ("RFP") *process every few years* in order to maintain market competitive benefits …. This process entails a solicitation of competitive bids from Pharmacy Benefit Manager ("PBM") vendors serving the marketplace and an evaluation of the submitted proposals.

('920 Patent 1:22-29, emphasis added.)

Having admitted that RFPs are a common method for selecting PBMs, the '920 Patent went on to assert that RFPs are inherently inadequate for the task.  PBMs apparently are inaccurate with cost projections, slippery with contract verbiage, and complicated in drug categorization and pricing.  (*See id.* 1:40-2:8.)

> A problem that arises with current implementations of RFPs is that plan sponsors (business entities, corporations, etc. with health- and medical-insurable employees) are reliant upon the cost projections provided by the PBM vendors, which often do not fairly or accurately represent the value of the bids being presented.

> Due to the complexities associated with the pharmacy benefit industry and pricing methodologies for prescription drugs, evaluation of PBM bids are typically subject to the calculations or stated cost projections provided by the vendors themselves.

> * * *

> Furthermore, due to the interpretive nature of contract language, PBM bid contract terms may be manipulated through subtlety in language and nuance in terminology, which cannot be fairly assessed to compare vendor RFP submissions. As a result, RFP submissions are highly subjective and prone to manipulation by PBM vendors

and bids cannot be fairly or objectively assessed by even the most knowledgeable industry professionals and data analysts ….

(*Id.* 1:29-59.)  Plan sponsors lack the time, expertise, and data to sift through these bid tactics, according to the patent.  (*See id.* 1:40-2:8.)

Into this purported sea of obfuscation and confusion, Truveris offered a lifeboat in the form of—

an improved method for conducting PBM request for proposals and calculating the projected costs of the plan subject to RFP bid terms and pricing proposals, resulting in an unbiased assessment of deal terms and pricing projections, presented on a consistent basis across RFP submissions.

('920 Patent 2:4-8.)

The complaint alleges: "On information and belief, SkySail infringes or induces or contributes to the infringement of at least claim 1 of the '920 Patent."  (Doc. No. 1 ¶ 30; *see also id.* ¶¶ 48-49.)  The complaint describes just one incident of infringement:  SkySail bid on a public solicitation issued by a state government, describing the services it could perform and the technology it would use to do so.  (*See id.* ¶¶ 26-48; *see also id.* Ex. 4.)

Specifically, the State of New Hampshire put out a public call for bids for "PBM Technology Platform Services."  (Doc. No. 1 ¶ 26; *see also* Doc. 1-4 PageID# 58.)  New Hampshire required from the outset that any consultant bidding "must have the capacity to perform the following for the PBM reverse auction: … Conduct an automated, online, PBM reverse auction."  (Doc. No. 1 ¶ 27; *see also* Doc. No. 1-4 PageID# 60.)  New Hampshire made plain that it wanted to hire a vendor to assist, *inter alia,* "in conducting an online automated reverse auction to support [the State] in comparing the pricing for its PBM procurement."  (Doc. No. 1-4 PageID# 62.)

6

Truveris alleges that "[o]n information and belief, SkySail won the New Hampshire bid." (*Id.* ¶ 28.)  That appears to be correct.  The New Hampshire Division of Procurement Support Services Bureau of Purchase Property published the following result online:



**Division of Procurement Support Services**
**Bureau of Purchase Property**

| Bid Description | PBM Technology Platform Services | Agency: | Statewide |
|---|---|---|---|
| Bid # | 2387-21 | Requisition: # | N/A |
| Agent Name | Ryan Aubert | Bid Closing: | 12/1/2020 2:00 PM EST |

| Vendor | Total Score |
|---|---|
| SkySail | 91.6 |
| Truveris | 45.1 |

| Indicates highest scoring vendor | |
|---|---|

*Available at* https://www.das.nh.gov/purchasing/docs/bids/rfp_2387_21_award.pdf (last visited September 7, 2022).

In paragraphs 22 through 25 and 30 through 48 of the complaint, Truveris scrutinizes SkySail's representations to New Hampshire in its bid proposal.  (*See* Doc. No. 1-4.)  Truveris compares SkySail's offered activities and services to the fifteen elements in Claim 1 of the '920 Patent.  (*Compare* Doc. No. 1 ¶ 11 *with id.* ¶¶ 22-25, 30-48.)  The similarity between the method Truveris patented in Claim 1 and what SkySail promised to do for New Hampshire is the basis for the claim of patent infringement.  (Doc. No. 1 ¶¶ 22-48.)

## Legal Standard for a Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "To survive a motion to dismiss, the pleading must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556); *see also dlhBOWLES, Inc. v. Jiangsu Riying Elecs. Co*., No. 5:21-CV-170, 2022 WL 36465, at *6 (N.D. Ohio Jan. 3, 2022) (resolving motion to dismiss patent claim).  Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'"  *Iqbal,* 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

"When determining whether [plaintiff's] complaint meets this standard 'we accept as true its factual allegations and draw all reasonable inferences in his favor, but we disregard any legal conclusions.'" *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) (quoting *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020)).  The Court "need not accept as true legal conclusions or unwarranted factual inferences."  *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).  "The plausibility of an inference depends on a host of considerations, including common sense ....'"  *Ryan*, 979 F.3d at 524 (quoting *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013)); *see also Gold Crest, LLC v. Project Light, LLC*, 525 F.Supp.3d 826, 833-34 (N.D. Ohio 2021).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2) (second alteration in original)).  In such a case, the plaintiff has not "nudged [its] claims across the line from

8

conceivable to plausible, [and the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

"According to the Sixth Circuit, the standard described in *Twombly* and *Iqbal* 'obliges a pleader

to amplify a claim with some factual allegations in those contexts where such amplification is

needed to render the claim plausible.'" *Morando v. Pyrotek, Inc*., No. 1:12CV1264, 2013 WL

949515, at *2 (N.D. Ohio Mar. 11, 2013) (quoting *Weisbarth v. Geauga Park Dist*., 499 F.3d

538, 541 (6th Cir. 2007)). "While a complaint need not set down in detail all the particulars of a

plaintiff's claim, 'Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with

nothing more than conclusions.'" *Gold Crest*, 525 F.Supp.3d at 834 (quoting *Iqbal*, 556 U.S. at

678–79 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice.")).

## Motion to Dismiss Challenging the Subject-Matter of a Patent

Here, the motion to dismiss asserts that the subject-matter of the patent in question is not

eligible for protection under 35 U.S.C. § 101. "Patent eligibility under § 101 is a question of law

that may contain underlying issues of fact." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358,

1367 (Fed. Cir. 2020), *cert. denied sub nom.*, 141 S. Ct. 1266 (2021). Patent eligibility may be

resolved at the motion to dismiss stage, *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1169

(Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 2747 (2019), if "there are no factual allegations that,

taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc.

v. Green Shades Software, Inc*., 882 F.3d 1121, 1125 (Fed. Cir. 2018); *see also Cybergenetics

Corp. v. Inst. of Env't Sci. & Rsch*., 490 F.Supp.3d 1237, 1240-41 (N.D. Ohio 2020), *aff'd*, 856

F. App'x 312 (Fed. Cir. 2021).

"Although the determination of patent eligibility requires a full understanding of the basic

character of the claimed subject matter, claim construction is not an inviolable prerequisite to a

validity determination under § 101." *Content Extraction and Trans. v. Wells Fargo Bank*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *see also Secured Mail Sols. LLC v. Universal Wilde, Inc*., 873 F.3d 905, 912 (Fed. Cir. 2017) (holding "claims to be patent-ineligible at the motion to dismiss stage based on intrinsic evidence from the specification without need for 'extraneous fact finding outside the record.'").

## Documents Subject to Judicial Notice

Both parties attached and relied on exhibits from the United States Patent & Trademark Office ("USPTO"). Those exhibits are mainly documents from the patent prosecution history that culminated in the '920 Patent.

Typically, when reviewing a motion to dismiss, a court does not consider materials outside the plaintiff's complaint. *See generally Winget v. JP Morgan Chase Bank, N.A*., 537 F.3d 565, 576 (6th Cir. 2008). But that general rule has exceptions pertinent to the present motion.

> In ruling on a motion to dismiss, a court may consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion to dismiss that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice.

*Flex Homes, Inc. v. Ritz–Craft Corp. of Mich*., 721 F.Supp.2d 663, 669 (N.D. Ohio 2010).

> Under certain circumstances, … a document that is not formally incorporated by reference or attached to a complaint may still be considered part of the pleadings. *See* 11 MOORE'S FEDERAL PRACTICE § 56.30[4] (3d ed.1998). This occurs when 'a document is referred to in the complaint and is central to the plaintiff's claim....' *Id*. In such event, 'the defendant may submit an authentic copy to the court to be considered on a motion to dismiss, and the court's consideration of the document does not require conversion of the motion to one for summary judgment.' *Id*.

*Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999).

A court may consider matters of public record in deciding a motion to dismiss without requiring that the motion be converted to one for summary judgment. *See, e.g., Embassy Realty*

*Invs., LLC v. City of Cleveland*, 877 F.Supp.2d 564, 570-71 (N.D. Ohio 2012); *United States of America ex rel. Dingle v. Bioport Corp.*, 270 F.Supp.2d 968, 972 (W.D. Mich. 2003) (observing that public records and government documents, including those available from reliable sources on the Internet, may be subject to judicial notice).  A court may take judicial notice of a fact "not subject to reasonable dispute" if it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  A court may take judicial notice on its own and "must take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(d).

Courts may take judicial notice of patents, patent applications, and patent prosecution histories.  *See Hoganas AB v. Dresser Indus., Inc*., 9 F.3d 948, 954 n.27 (Fed. Cir. 1993); *Standard Havens Prods., Inc. v. Gencor Indus., Inc*., 897 F.2d 511, 514 n. 3 (Fed. Cir. 1990) (noting that it is appropriate to take judicial notice of USPTO correspondence which is part of the public record); *Mettke v. Hewlett Packard Co*., No. 2:11-CV-00410, 2012 WL 1158629, at *3 (S.D. Ohio Apr. 6, 2012) (same).

Truveris filed a motion requesting judicial notice of the items it attached from the USPTO, to which SkySail did not object.  (*See* Doc. No. 22.)  That motion for judicial notice is hereby GRANTED.  SkySail attached to its motion to dismiss several documents from the prosecution of the '920 Patent in the USPTO.  Truveris did not object to those and instead crafted an argument for why those documents bolster Truveris' position.  (*See* Doc. No. 21 PageID# 402-403.)  Without objection from either party, this Court will take judicial notice of the patent prosecution documents submitted by both parties.

11

## Legal Discussion

### I.        Direct Infringement

Truveris claims that SkySail infringed Claim 1 of the '920 Patent, as evidenced by SkySail's bid submitted in response to the New Hampshire RFP, which is attached to the complaint as Exhibit 4.

### A.        Patent Law

The Constitution gives Congress the power to secure for inventors a limited time of exclusive use for their inventions.  U.S. CONST., art. I, § 8, cl. 8.  Congress exercised that authority with the Patent Act of 1952, which defines subject matter that may be patented.  It specifies four categories of inventions or discoveries that are eligible for protection: "any new and useful process, machine, manufacture, or composition."  35 U.S.C. § 101.  "The term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."  35 U.S.C. § 100(b).  "In choosing such expansive terms … modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope."  *Diamond* v. *Chakrabarty*, 447 U.S. 303, 308 (1980).[3]

That said, "[a]n idea of itself is not patentable."  *Rubber-Tip Pencil Co. v. Howard*, 20 Wall. (87 U.S.) 498, 507 (1874).  The Supreme Court long recognized exceptions to patentability so that no one could monopolize "laws of nature, physical phenomena, and abstract

---

[3] "The § 101 patent-eligibility inquiry is only a threshold test.  Even if an invention qualifies as a process, machine, manufacture, or composition of matter, in order to receive the Patent Act's protection the claimed invention must also satisfy 'the conditions and requirements of this title.'  § 101.  Those requirements include that the invention be novel, *see* § 102, nonobvious, *see* § 103, and fully and particularly described, *see* § 112."  *Bilski v. Kappos*, 561 U.S. 593, 602 (2010).

ideas." *Chakrabarty*, 447 U.S. at 309; *see also Le Roy* v. *Tatham*, 14 How. 156, 174-175 (1853) ("A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right.").  The concepts covered by these exceptions are "part of the storehouse of knowledge of all men … free to all men and reserved exclusively to none.  *Funk Brothers Seed Co.* v. *Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948); *Bissell Carpet-Sweeper Co.*, 72 F. 67, 75 (6th Cir. 1895) ("Patents cover the means employed to effect results.  Neither an idea nor a function, nor any other abstraction, is patentable ….").

Patent disputes carry real economic consequences not only for the parties but also for the market sectors in which they compete.  "[T]he patent law faces a great challenge in striking the balance between protecting inventors and not granting monopolies over procedures that others would discover by independent, creative application of general principles." *Bilski*, 561 U.S. at 606.

> Patent protection is, after all, a two-edged sword.  On the one hand, the promise of exclusive rights provides monetary incentives that lead to creation, invention, and discovery.  On the other hand, that very exclusivity can impede the flow of information that might permit, indeed spur, invention, by, for example, raising the price of using the patented ideas once created, requiring potential users to conduct costly and time-consuming searches of existing patents and pending patent applications, and requiring the negotiation of complex licensing arrangements.

*Mayo Collaborative Servs. v. Prometheus Labs., Inc*., 566 U.S. 66, 92 (2012).

The Supreme Court has crafted a two-step test to evaluate the eligibility of a patent's claimed subject matter.  *See generally id.* and *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014).

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts [*i.e.*, laws of nature, natural phenomena, or abstract ideas].
>
> If so, we then ask, what else is there in the claims before us?  To answer that question, we consider the elements of each claim both individually and as an

13

> ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application.  We have described step two of this analysis as a search for an inventive concept — *i.e.,* an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.

*Alice*, 573 U.S. at 217–18 (citations and quotations omitted).  Thus, "an invention is not rendered ineligible for patent simply because it involves an abstract concept.  Applications of such concepts to a new and useful end … remain eligible for patent protection." *Id.* at 217.

"There is no precise definition of … business method patents." *Bilski*, 561 U.S. at 607. "[S]ome business method patents raise special problems in terms of vagueness and suspect validity." *Id.* at 608; *see also eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 397 (2006) (Kennedy, J., concurring).  The Supreme Court grappled with business method patents directed to ineligible abstract concepts in *Bilski* and *Alice*.

> The claims at issue in *Bilski* described a method for hedging against the financial risk of price fluctuations.  Claim 1 recited a series of steps for hedging risk, including: (1) initiating a series of financial transactions between providers and consumers of a commodity; (2) identifying market participants that have a counter-risk for the same commodity; and (3) initiating a series of transactions between those market participants and the commodity provider to balance the risk position of the first series of consumer transactions.  Claim 4 put the concept articulated in claim 1 into a simple mathematical formula.  *  *  *

> Specifically, the claims described the basic concept of hedging, or protecting against risk.  The Court explained that hedging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class.  The concept of hedging as recited by the claims in suit was therefore a patent-ineligible abstract idea….

*Alice*, 573 U.S. at 218-19 (describing *Bilski*, 561 U.S. at 599-612) (quotations and citations omitted).

In *Alice*, the patent claims involved a method of running financial transaction orders that draw on financial accounts through a third-party intermediary to mitigate risk.  The intermediary created and updated 'shadow' records to reflect the value of each party's several accounts at

14

various exchange institutions.  The intermediary would permit transaction orders to go through if the shadow record indicated that the party's accounts together had sufficient resources to cover. The intermediary issued irrevocable instructions to the exchange institutions on which transactions to permit and carry out.  *Alice*, 573 U.S. at 219-20.

> Like the risk hedging in *Bilski*, the concept of intermediated settlement is a fundamental economic practice long prevalent in our system of commerce.  The use of a third-party intermediary (or 'clearing house') is also a building block of the modern economy.  Thus, intermediated settlement, like hedging, is an 'abstract idea' beyond the scope of § 101.

*Id.* (quotations and citations omitted).

Together *Bilski* and *Alice* teach that common commercial activities and fundamental economic practices fall into the category of 'abstract ideas,' which generally are not eligible for patent protection.  *See buySAFE, Inc. v. Google, Inc*., 765 F.3d 1350, 1354 (Fed. Cir. 2014) ("[T]he Court in both cases relied on the fact that the contractual relations at issue constituted 'a fundamental economic practice long prevalent in our system of commerce.'"); *see* also *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) ("The category of abstract ideas embraces fundamental economic practices long prevalent in our system of commerce, including longstanding commercial practices and methods of organizing human activity.") (citations and quotations omitted).

The progeny of *Bilski* and *Alice* have since considered the abstract idea exception as it pertains to patents on computerized business methods.  "In some instances, patent-ineligible abstract ideas are plainly identifiable and divisible from the generic computer limitations recited by the remainder of the claim."  *DDR Holdings, LLC v. Hotels.com, L.P*., 773 F.3d 1245, 1256 (Fed. Cir. 2014).  For example, mathematical algorithms, including those executed on a generic computer, are deemed to be ineligible abstract ideas.  *Id.*  The Federal Circuit has considered patent claims directed to various abstract ideas implemented on computers and online.  *See*

15

*Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016), *cert. denied*, 138 S. Ct. 469 (2017) ("[T]he decisional mechanism courts now apply [to identify an abstract idea] is to examine earlier cases in which a similar or parallel descriptive nature can be seen—what prior cases were about, and which way they were decided.").

> In *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715-16 (Fed. Cir. 2014), the claims merely recited the abstract idea of using advertising as a currency as applied to the particular technological environment of the Internet.  In *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014), the claims recited no more than using a computer to send and receive information over a network in order to implement the abstract idea of creating a 'transaction performance guaranty.'  In *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344-45 (Fed. Cir. 2013), the claims merely recited 'generalized software components arranged to implement an abstract concept [of generating insurance-policy-related tasks based on rules to be completed upon the occurrence of an event] on a computer.'  And in *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012), the claims recited no more than the use of a computer 'employed only for its most basic function, the performance of repetitive calculations,' to implement the abstract idea of managing a stable-value protected life insurance policy. … *Although many of the claims recited various computer hardware elements, these claims in substance were directed to nothing more than the performance of an abstract business practice on the Internet or using a conventional computer.  Such claims are not patent-eligible.*

*DDR*, 773 F.3d at 1256 (emphasis added).  Lower courts also have invalidated computer-operated business method patents involving a broad range of abstract ideas.[4]

---

[4] *See, e.g., Open Text S.A. v. Alfresco Software Ltd.*, No. 13–CV–04843–JD, 2014 WL 4684429, at *4 (N.D. Cal. Sept. 19, 2014) (invalidating computer patent based upon the abstract idea of "interacting with customers"); *Comcast IP Holdings I, LLC v. Sprint Comm's Co. L.P.*, 55 F.Supp.3d 544, 547, No. CV 12–205–RGA, 2014 WL 3542055, at *3 (D. Del. 2014) ("[T]he abstract idea at the heart of a [a patent for a telephony network optimization method] is the very concept of a decision"); *DietGoal Innovations LLC v. Bravo Media LLC*, 33 F.Supp.3d 271, 287, No. 13 CIV. 8391 PAE, 2014 WL 3582914, at *14 (S.D.N.Y. 2014) (invalidating patent based upon "the abstract idea of meal planning"); *Planet Bingo, LLC v. VKGS LLC*, 576 Fed. Appx. 1005, 1008 (Fed. Cir. 2014) (invalidating patent directed to "the abstract idea of managing/playing the game of Bingo"); *Walker Digital, LLC v. Google, Inc.*, 66 F.Supp.3d 501, 509, C.A. No. 11–318–LPS, 2014 WL 4365245, at *6 (D. Del. 2014) (invalidating patent directed at "basic concept of controlled exchange of information about people as historically practiced by matchmakers and headhunters" implemented over "generic computer components (processor, memory)").

It is *not* enough for a patent simply to "recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations…." *DDR*, 773 F.3d at 1259. Likewise, a patent may not "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* at 1257.

Moreover, claims may not be worded so broadly or generically that they would effectively preempt nearly every other actor's engagement in a fundamental business practice. *See id.* at 1259.  "The concern of § 101 is not novelty but preemption." *Amdocs*, 56 F.Supp.3d at 825; *see also DDR*, 773 F.3d at 1257 (specifically noting that the novelty of the claims – describing a method that was previously unknown and never employed before – was not alone sufficient to render its claims patent-eligible).

Where, by contrast, inventions solve computer-specific problems, the Federal Circuit holds that the patents are not abstract – and therefore *are* patent eligible – under *Alice* step one.  *See Uniloc USA, Inc. v. LG Elecs. USA, Inc*., 957 F.3d 1303, 1307 (Fed. Cir. 2020) (collecting cases).  "[O]vercoming a problem specifically arising in the realm of computer networks" is patent eligible.  *Id*. (quoting *DDR*, 773 F.3d at 1257-59); *see also Visual Memory LLC v. NVIDIA Corp*., 867 F.3d 1253, 1259-60 (Fed. Cir. 2017) (patent eligible claims "focus[ed] on a 'specific asserted improvement in computer capabilities,'" namely the accommodation of different types of processors without compromising performance); *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc*., 880 F.3d 1356, 1359-63 (Fed. Cir. 2018) (patent eligible claims

directed to an improved user interface that enabled users to more quickly access stored data and programs in small-screen electronics).[5]

In sum, even when an abstract concept lurks within a patent's subject matter, a claim still may be valid.  But only if: under *Alice* step one, the claim is not *directed to* that abstract idea, or otherwise, under *Alice* step two, the claim elements contain an 'inventive concept' sufficient to 'transform' the abstract concept.

With this backdrop in mind, the Court analyzes the '920 Patent using the *Alice* framework. "[I]t is not always easy to determine the boundary between abstraction and patent-eligible subject matter."  *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015).  Nonetheless, in *Internet Pats.*, the Federal Circuit affirmed a district court's resolution of those issues on a motion to dismiss.  *Id.* at 1349.

### B.  Summary of the Parties' Contentions

SkySail moved to dismiss the complaint on the grounds that the '920 Patent is directed to ineligible subject-matter and is therefore invalid or unenforceable.  (Doc. No. 13-1 PageID# 223-224.)  The primary argument is that "the '920 Patent merely takes an admittedly well-known abstract idea – running a 'reverse auction' to select a prescription drug plan[6] – and implements it using admittedly generic computer components and processes."  (*Id.* PageID# 231, 238, 239.)

---

[5] The above survey of precedent admittedly offers only a cursory description of the inventions and patent claims at issue.  That is for brevity – as those cases each involve technologies and industries about which much could be (and has been) written.

[6] *See generally* Colo. Rev. Stat. Ann. § 24-50-1203(9) ("'PBM reverse auction' means an automated, transparent, and dynamically competitive bidding process conducted online that starts with an opening round of bids and allows qualified PBM bidders to counter-offer a lower price for as many rounds of bidding as determined by the department for a multiple health plan prescription drug purchasing group.").

"And the '920 Patent also admits that the abstract idea of using a reverse auction to select a prescription drug plan was already well-known in the industry.  For example, in the '920 Patent's 'Background of the Invention,' it details how using a reverse auction to solicit, receive, analyze, and pick a prescription drug plan was already well-known in the industry."  (*Id.* PageID# 232.)

The invention here, SkySail urges, is "simply implementing all of these well-known steps in a pharmaceutical reverse auction 'using a programmed computer.'"  (*Id.* PageID# 233.)  The computer aspects mentioned in the '920 Patent are generic, SkySail charges.  (*Id.* PageID# 234-235.)  "That implementing the reverse auction on and with computers may result in increased speed and efficiencies is of no matter," SkySail concludes, "because the improved speed or efficiency inherent with applying the abstract idea on a computer is insufficient to render the claims patent eligible as an improvement to computer functionality."  (*Id.* PageID# 239, citation and quotation omitted.)  SkySail likens the '920 Patent to patents that courts have deemed invalid because they are directed to the collection, analysis, and presentation of data.  (*Id.* PageID# 239-243.)

SkySail points out that the USPTO five times previously had rejected the Truveris inventors' application.  (*Id.* PageID# 237-238.)  Those rejection documents are attached to SkySail's moving papers.  (*Id.* PageID# 222; Doc. Nos. 13-2 through 13-6.)

The lesson to be drawn from those prior rejections, Truveris rejoins, is that the version of the '920 Patent that ultimately *was* allowed and issued must have overcome prior problems.  (Doc. No. 21 PageID# 380, 402-403.)

> The USPTO patent examiner carefully considered whether the subject matter of the claims was eligible subject matter and ultimately decided that it was eligible. Therefore, the USPTO already considered SkySail's arguments and rejected them. Instead of accepting this reality, SkySail makes the unsupported assumption that because the Examiner did not provide reasons in the Notice of Allowance for allowing the patent to issue (*see id.*) that the Examiner gave up or simply got it

> wrong.  Not so.  SkySail's purported overview of the prosecution history tells only one side of the story.  What SkySail overlooks is that the patent application underwent a thorough review process and, in the end, *all* of the Examiner's rejections were successfully overcome after considering the Applicant's amendments and remarks in support of patent eligibility.

(*Id.* PageID# 402, emphasis in original.)  Truveris attaches several of its USPTO submissions filed in response to prior rejections.  (*See* Doc. Nos. 21-2 through 21-6.)

The question thus becomes whether "the '920 patent describe[s] 'specific improvements in computer technology,' as Truveris contends."  (*Id.* Doc. No. 21 PageID# 380.)  "SkySail argues that the '920 patent is invalid because the claims are directed to the abstract idea of an outcry auction, where humans shout out their bids and a winning bid is picked.  This is an over-generalization of the claims, which the Federal Circuit has repeatedly cautioned against," Truveris cautions.  (*Id.*)  The data collections and manipulations described in the '920 Patent could not be done by humans or by hand, Truveris argues.  (*Id*. PageID# 380-381.)

A common refrain in Truveris' arguments is to call attention to the procedural posture.  (*Id.* PageID# 385-386, 388, 400, 403.)  Whether "the invention is not an improvement in computer technology is a factual dispute that cannot be resolved by way of a motion to dismiss," Truveris urges.  (*Id*. PageID# 382.)  Likewise, whether the claim elements are routine or conventional are questions of fact.  (*Id*. PageID# 383.)  Truveris stresses that the '920 Patent is entitled to a presumption of validity.  (*Id*. PageID# 402-403.)

Truveris acknowledges that "sponsors *often* shop around for PBMs and *regularly* enter into a request for proposal ('RFP') process with potential PBMs."  (*Id*. PageID# 388, emphasis added.)  The '920 Patent "solves a real-world problem of subjective and manipulated deal terms and pricing projections," and "generates an 'apples-to-apples' comparison between competing bids."  (*Id*. PageID# 389-390.)

> The claimed invention generates what prior systems and methods could not –
> consistent and objective comparisons of bids and in less time.  To generate unbiased
> bid comparisons, the '920 patent claims require specific computer-implemented
> steps that can be carried out using a structured computer system configuration.

(*Id*. PageID# 390.)

Truveris argues that conducting an RFP electronically is fundamentally different "than the asserted analog predecessor of an open outcry auction." (*Id*.)  The problem to be overcome, Truveris recounts, was that "plan sponsors are unable to assess in a reasonable period of time the relative value of the proposed contacts in objective terms," *i.e.*, the bids from PBMs.  (*Id.* PageID# 391.)  Truveris distinguishes its RFP method from the inventions in several patent precedents.  (*Id.* PageID# 393-396.)

Truveris argues that the '920 Patent is directed to improvement of computer capabilities.

(*Id.* PageID# 392-394.)

> The sheer volume of unmanageably large claims data sets would prevent a plan
> sponsor from evaluating RFP submissions in a reasonable period of time.  Such an
> issue did not exist in pre-electronic outcry auctions nor was there a solution to these
> problems prior to the invention.

(*Id.* PageID# 393, patent quotation omitted.)  Truveris scolds SkySail for failing to consider the patent claims as a whole and relying on disputed factual assertions.  (*Id.* PageID# 397.)  Truveris cites aspects of the Claim 1 elements that show an inventive concept and a transformation of abstract concepts.  (*Id.* PageID# 397-402.)

On reply, SkySail notes that "nowhere in its Complaint or its Opposition does it identify any claimed specific improvement in computer technology.  Instead, Truveris repeatedly points to ideas about how best to conduct a reverse auction for selecting prescription drug plans." (Doc. No. 24 PageID# 486.)  Truveris' characterizations regarding computer facets and technology are conclusory, SkySail rejoins.  (*Id.* PageID# 486-487.)  The reasonable inference rule for a motion to dismiss does not apply to legal conclusions, such as Truveris' assertion that its patent is

21

directed to computer operation improvements.  (*Id.* PageID# 489-490.)  There are not sufficient facts to show any particular computer improvements, SkySail concludes.  (*Id.* PageID# 490-497.)

## C.    *Alice* **Step One**

"*Alice* step one presents a legal question that can be answered based on the intrinsic evidence.  The analysis under *Alice* step one is whether the claims as a whole are 'directed to' an abstract idea."  *CardioNet*, 955 F.3d at 1372 (recognizing patent prosecution history as proper intrinsic evidence to consider in *Alice* step one); *see also Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1346 (Fed. Cir. 2019) ("[T]he specification [is] helpful in illuminating what a claim is 'directed to.'") (alterations in original; citation omitted).

"[T]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether their character as a whole is directed to excluded subject matter."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quotation and citation omitted).  A patent claim is "read as a whole, and in light of the written description."  *CardioNet*, 955 F.3d at 1368.  The key question is whether the Claim 1 elements together "focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery."  *McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1314 (Fed. Cir. 2016).[7]

> In determining what the claims are directed to and whether they are directed to an abstract idea, a court may well consult the plain claim language, written description, and prosecution history and, from these sources, conclude that the claims *are directed to automating a longstanding or fundamental practice*.

---

[7] The Federal Circuit acknowledges "that there is considerable overlap between step one and step two," *Amdocs*, 841 F.3d at 1294, because "the two stages involve overlapping scrutiny of the content of the claims."  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

> Similarly, the court may consult the intrinsic evidence and conclude that the claims *are directed to improving the functionality of a computer or network.*

*CardioNet*, 955 F.3d 1372-73 (emphasis added).

The two emphasized phrases above from *CardioNet* capture the differing views espoused here by Truveris and SkySail.  Is the '920 Patent focused on improving computer functionality?  Or does it merely use existing computer functionality to perform a longstanding economic activity?

### 1.    The Parties' Differing Characterizations of Claim 1

Truveris contends that Claim 1 is directed to technological innovation, and so Truveris frames the question at hand as: "Whether the claims are plausibly directed to a specific improvement in computer technology, namely, electronic management of a request for proposal…."  (Doc. No. 21 PageID# 379.)  Truveris argues that–

> the '920 patent claims require specific computer-implemented steps and a structured configuration of a computer system that is directed to and resolves a specifically identified problem in the prior state of the art.  This removes the '920 patent claims from the realm of conventional computer implementations of known systems and methods.

(Doc. No. 21 PageID# 401.)  Truveris scoffs at any comparison to an open 'outcry' auction, pointing to the computer-implemented nature of the '920 Patent.

But SkySail urges that "the '920 Patent claims nothing more than using a generic computer system in a conventional manner to facilitate a reverse auction for selecting prescription drug plans.  Reverse auctions have been carried out by humans, without computers and the internet, for hundreds of years."  (Doc. No. 13-1 PageID# 224.)

Given these markedly different perspectives, the Court must arrive at its own description of what Claim 1 is "directed to."  The fairest, most objective way to encapsulate Claim 1 is to focus on the plain text of the patent as allowed and issued.

## 2.    The USPTO's Skepticism Regarding Subject-Matter Eligibility

Exhibits 1 through 5 to Defendant's motion to dismiss are decisions from the USPTO

between 2016 and 2020 repeatedly rejecting prior versions of the Truveris inventors' patent

application.  (Doc. Nos. 13-2 through 13-6.)  Each time the USPTO pointed out, *inter alia*, its

view that the patent application was directed to ineligible subject matter under § 101.

In 2016, 2017, and again in 2018, the USPTO decided that the claims were "directed to the

abstract idea of receiving, standardizing, and presenting bids to a user."  (Doc. No. 13-2 PageID#

251; Doc. No. 13-3 PageID# 264-65; Doc. No. 13-4 PageID# 278-79.)  The USPTO applied both

*Alice* steps.  (Doc. No. 13-2 PageID# 252-53; Doc. No. 13-3 PageID# 264-66; Doc. No. 13-4

PageID# 278-81.)  The USPTO concluded each year that the technical aspects of the claimed

invention were conventional or generic computer operations.  (*See* Doc. No. 13-2 PageID# 252-

53; Doc. No. 13-3 PageID# 265-66; Doc. No. 13-4 PageID# 279-81.)  Notably, the *Alice* step

two analysis was a bit more detailed in 2018 that in prior years.  (*See* Doc. No. 13-4 PageID#

279-81.)

In 2019 and early 2020, the USPTO again rejected the application.  (*See* Doc. Nos. 13-5 and

13-6.)  But the § 101 analysis changed to find that the process steps were akin to "mental

processes."  (Doc. No. 13-5 PageID# 288; Doc. No. 13-6 PageID# 296.)  More specifically, the

USPTO wrote that—

> limitations directed to managing selection of a prescription drug plan by managing
> requests for proposals and calculating plan costs for a contract, as drafted, is a
> process that, under its broadest reasonable interpretation, is a certain method for
> organizing human activities, creating a contractual relationship, as well as a mental
> process.  That is, other than reciting 'by a processor,' nothing in the claim element
> precludes the step from practically being performed in the mind.

(*Id.*)  As in prior years, the USPTO found that the technical descriptions amounted to nothing

more than conventional computer operations.  (Doc. No. 13-5 PageID# 288-89; Doc. No. 13-6

PageID# 296-97.)

Then later, in September 2020, the Truveris inventors prevailed.  The USPTO issued a notice of allowance for the '920 Patent.  (Doc. No. 13-7.)[8]  The allowance was issued in response to an amendment from the Truveris inventors dated September 4, 2020.  (*See id.* PageID# 304 at No. 1.)

Truveris argues that something in the September 2020 amendment must have persuaded the USPTO to overcome prior rejections.  That inference seems reasonable.  However, Truveris' brief in opposition to the motion to dismiss does not assist the Court in identifying or understanding exactly (i) what changes were made to the invention, (ii) what changes were made to the claim elements as described, (iii) what different or additional arguments were made to the USPTO in support of the September 4, 2020 amended version of the patent application, or (iv) which argument(s) or different views regarding eligible subject matter were embraced by the patent examiner in September 2020.  Instead, Truveris merely attaches Exhibits 1 through 5, which are Truveris inventors' submissions to the USPTO between 2017 and 2020.  (*See* Doc. No. 21-1 PageID# 408-09; *see also* Doc. Nos. 21-2 through 21-6.)

The implication is for this Court to sort through the history of those submissions found in Plaintiff's opposition Exhibits 1 through 5, along with the history of rejections found in Defendant's Exhibits 1 through 5.  Truveris expects the Court to figure out what was new, what was different, and what was persuasive to the examiner.  But "'judges are not like pigs, hunting for truffles' that might be buried in the record."  *Emerson v. Novartis Pharms. Corp.*, 446 F.

---

[8] It is incorrect to suggest – as Truveris does, (Doc. No. 21 PageID# 402) – that the USPTO considered *SkySail's* arguments and rejected those.  There is no evidence that SkySail appeared in the USPTO to file an objection to the Truveris inventors' application.

App'x 733, 736 (6th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.

1991)).

Notwithstanding, this Court has run its own comparison of the text from:

(i)  Claim 1 as it was submitted in 2019, (Doc. No. 21-6, Truveris opposition Exhibit 5 at

internal pages 11-12), *i.e.,* which resulted in the most recent rejection from the

USPTO, (Doc. No. 13-6); *versus*

(ii)  Claim 1 as it was amended and submitted on September 4, 2020, (Doc. No. 21-2,

Truveris opposition Exhibit 1 at internal pages 15-17), *i.e.*, the version allowed by

the USPTO, (Doc. No. 13-7).

The result of that text comparison, showing strike-though deletions and underlined additions, is

set forth below:

1. A computer-implemented method performed by a computer system for
supporting an entity with selection of a prescription drug plan, said method
comprising:

receiving a request to initiate a request for proposal (RFP) process from a particular
remote client system of a plurality of remote client systems, the request to initiate
the RFP process being for a prescription drug plan for a particular entity;

obtaining a particular set of historical drug claims for the particular entity from a
remote database;

generating an RFP for the particular entity for the prescription drug plan based on
the particular set of historical drug claims obtained from the remote database;

distributing said RFP to a plurality of remote pharmacy benefit manager (PBM)
systems to participate in submission of a bid in response to said RFP;

receiving an electronic confirmation from one or more of said plurality of remote
PBM systems acknowledging participation in said RFP;

receiving one or more bids containing pricing information and contract terms from
the one or more of said plurality of remote PBM systems having acknowledged
participation, the pricing information comprising respective pricing terms
corresponding to one or more drug claims, the one or more bids each including a

corresponding PBM-indicated drug classification for each drug claim of the one or more drug claims;

~~obtaining a particular set of historical drug claims;~~

obtaining, from one or more third party systems, data indicators indicating third-party-indicated drug classifications for the historical drug claims of the particular set of historical drug claims, the third-party-indicated drug classifications including a generic drug classification, a brand drug classification, and a specialty drug classification~~;~~, the third party systems being different than the remote database, the particular remote client system and the plurality of PBM systems;

classifying each historical drug claim of the particular set of historical drug claims into one or more third-party-indicated drug classifications of the third-party-indicated drug classifications based on the data indicators, the classifying disregarding the corresponding PBM-indicated drug classification;

obtaining, from the one or more third-party systems, price inflation parameters and utilization inflation parameters for each third-party-indicated drug classification of the one or more third party- indicated drug classifications;

obtaining historical utilization data associated with the particular set of historical drug claims;

~~projecting~~ using the particular set of historical drug claims from the remote database to project costs forward by applying the price inflation parameters to the pricing information of each bid of said one or more bids based on the one or more third-party-indicated drug classifications, and applying the utilization inflation parameters to the historical utilization data associated with the particular set of historical drug claims;

 calculating a corresponding estimated plan cost for each bid of the one or more bids based on the projecting costs forward, the corresponding estimated plan cost of each bid of the one or more bids having accounted for price inflation and utilization inflation based on the same price inflation parameters, the same utilization inflation parameters, and the same third-party-indicated drug classifications;

calculating a contract terms cost for the contract terms of each bid of the one or more bids;

generating scores for each bid of said one or more bids based on the corresponding estimated plan cost and on the contract terms cost; and

sending at least one bid of the one or more bids and at least one score of the scores to said particular remote client system to support selection of the drug prescription plan from the one or more bids.

(Comparison of 'original' Claim 1 from Doc. No. 21-6 [submitted to the USPTO in 2019] against 'revised' Claim 1 from Doc. No. 21-2 [submitted to the USPTO on September 4, 2020].)

The step of obtaining data regarding historical drug claims was moved up earlier in the process.  As a result, this material would be obtained *before* the RFP was publicized to potential bidders.  Otherwise, there are only *minor* differences between Claim 1 as rejected in 2019 *versus* Claim 1 as allowed in 2020.

The changes did not make any major switch to the ordered steps that comprise the method (with the exception of moving up the retrieval of historical drug claim, discussed above).  Those changes did not alter the subject matter to which the claim was directed.  The changes did not alter the overall, fundamental character of the invention.  The changes did not materially change the scope of the claimed method or the limits of what would be preempted.  The changes did not reveal some new or different aspect of innovation different in kind or degree from what was previously laid out in the prior submission in 2019.

Because the differences are somewhat superficial, many of the USPTO's expressed § 101 concerns when it rejected the Truveris inventors' application in 2016 through 2019, (*see* Doc. Nos. 13-2 through 13-6), still haunt the '920 Patent, notwithstanding that the USPTO later allowed the patent to issue in September 2020.  Respect for the expertise of the USPTO in these circumstances means that the Court does not entirely disregard the § 101 concerns expressed by the USPTO in 2019 and prior years.

### 3.    Step One Legal Conclusions

Patent eligibility depends on whether a claim "as a whole is directed to excluded subject matter."  *Enfish*, 822 F.3d at 1335; *see also CardioNet*, 955 F.3d at 1368 & 1372 (analyzing "claims as a whole" for step one).  As elaborated below, the '920 Patent is directed to ineligible

subject matter under 35 U.S.C. § 101.  It is directed to an abstract concept, in the form of a fundamental economic practice long prevalent in our system of commerce.  Although the method described is implemented by a computer, the patent claim as a whole is not directed to computer improvements.  Rather, Claim 1 is directed to the solicitation of and price comparison among vendor bids, which is a fundamental economic practice.

### a)  Claim 1 is directed to an abstract idea in the form of a longstanding economic practice.

The Abstract of the '920 Patent says that the system and method are "for managing selection of a prescription drug plan."  (Doc. No. 1-1 PageID# 33.)  The summary of the invention described a system and method "for managing a request for proposal."  ('920 Patent 2:40.)  The stated impetus was that "a solution is required to provide an improved method for conducting PBM request for proposals and calculating the projected cost."  ('920 Patent 2:3-5.)

The text of the '920 Patent, read as a whole, promises to improve (i) how RFPs are conducted and (ii) how PBMs' respective bids and plans are compared.  While computer-implemented features may make things happen faster, easier, or on a grander scale, the character of the patent claims is directed to the solicitation, and the comparison, of bids from PBM vendors.  On its face, the '920 Patent is directed to common economic activity, *i.e.*, soliciting bidders, sorting through their proposed plans to compare pricing, and deciding how to choose among them.

At step one, courts consider "the problem facing the inventor as well as what the patent describes as the invention."  *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) (internal quotation omitted), *cert. denied*, 140 S. Ct. 983 (2020).

The '920 Patent explicitly identifies a problem to which it supplies a solution.  Notably, that problem is *not* depicted as a void in computer hardware or software.  Instead, the problems at the

heart of the '920 Patent are *economic* in nature.  Truveris identified problems with the market actors, *i.e.,* with PBM bidders and plan sponsors.  PBM bidders apparently disguise the true costs/price of their offered drug benefit plans.  Sponsors lack the time or expertise to decipher prescription drug pricing issues so as to understand and compare PBM bids.  These problems were not caused by the existing technology; rather, such problems are inherent when selecting a vendor for a massively expensive in a complex, specialized market sector.

That said, the 'problem' described in the '920 Patent is not particularly unique.  Vendors or bidders in *any* industry may use favorable economic projections, dense contract language, or opaque categories to make their service or product appear cheaper or more cost-effective.  Customers rarely if ever have as much insider knowledge about a market segment as the vendors who operate and compete in that segment.  So, when soliciting bids, a sponsor/customer in nearly any industry may be at an informational disadvantage *vis-à-vis* the vendor-bidders.

The point here is that the '920 Patent aims to solve a problem in how an economic decision is made and how an economic transaction is carried out.  Indeed, the '920 Patent recites a central problem as being pricing dysfunction and information asymmetry in the PBM market.  In sum, the '920 Patent suggests a method to overcome problems that are quintessentially commercial or economic.[9]  Similarly, the purported benefit of the invention is an economic one, *i.e.,* more reliable price comparisons and resulting cost savings.

In *Alice*, the Supreme Court described the use of clearing houses and intermediaries in financial trading and transactions as being basic building blocks of the economy.  573 U.S. at 219-20.  In *Bilski* and *Alice,* the abstract concept was hedging against risk, which was

---

[9] The '920 Patent has *very* little mention, and virtually no detail, of particular gaps or shortcomings in the software or web platforms used to conduct RFPs.

accomplished by specific practices and activities, such as intermediated settlement by clearing houses in *Alice*.

In light of the above, this Court concludes as a matter of law that Claim 1 of the '920 Patent is directed to an abstract concept and a commonplace economic activity.  Putting out requests for bids, using rounds of bidding to winnow the number of bidders, and using some objective means to translate or to compare bids "is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class."  *Bilski*, 561 U.S. at 611.

Here, the '920 Patent involves RFP and bidding practices that are even more ubiquitous than the economic activities in *Bilski* and *Alice*.  Claim 1 facilitates price normalization by translating disparate bids into some common metric to allow for 'apples to apples' comparison.  But that is every bit as much fundamental economic activity and abstract concept as the risk-hedging at issue in *Bilski* and *Alice*.  This Court concludes under *Alice* step one that the '920 Patent is directed to an abstract economic concept ineligible for protection under 35 U.S.C. § 101 – *i.e.*, unless the detailed review of the claim elements in *Alice* step two shows that the abstract concept was transformed.[10]

> **b)    Claim 1 may contemplate – but is not directed to – improvement in computer/software functionality.**

Truveris acknowledges that a determination of whether Claim 1 is directed to specific computer improvements "can be drawn under either step of the *Alice* framework."  (Doc. No. 21 PageID# 382.)  The claimed invention here "relates to a *computer-implemented* system and method for managing" an RFP.  (*Id.* 2:37-40 (emphasis added).)  "However, not every claim that

---

[10] Note that step two aims to ensure that the patent would not preempt or 'lock up' use of an underlying abstract concept or common economic practice itself.  Related to that concern, courts consider in step one the scope or breadth of the claims as a whole – to gain a sense of what market activity or segment the patent would preempt.  *See* Part I.C.3.c., *infra*.

recites concrete, tangible components escapes the reach of the abstract-idea inquiry." *In re TLI Commc'ns LLC Pat. Litig*., 823 F.3d 607, 611 (Fed. Cir. 2016); *see also Alice,* 573 U.S. at 222 (claims that recite general-purpose computer components are nevertheless "directed to" an abstract idea); *Mortg. Grader, Inc. v. First Choice Loan Serv. Inc*., 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (claims reciting an "interface," "network," and a "database" were nevertheless directed to an abstract idea).

Although the '920 Patent refers to a "computer-implemented method performed by a computer system," (*Id.* 9:17-18), it is both general and noncommittal regarding the particulars.

> [0022] The algorithms and displays presented herein are not inherently related to any particular computer or other apparatus.  Various general purpose systems may be used with programs in accordance with the teachings herein or it may prove convenient to construct more specialized apparatus to perform the required method steps.  The required structure for a variety of these systems will be apparent from the description above.  In addition, the present invention is not described with reference to any particular programming language.  It will be appreciated that a variety of programming languages may be used to implement the teachings of the invention as described herein.

> [0023] The present invention may be provided as a computer program product, or software….

(Specification to Patent Application No. 13/999,121 at pp. 7-8 (filed on Jan. 16, 2014) (hereinafter, "Specification"); *see also* '920 Patent 3:54-67 (same text).)  Generic descriptions of computer hardware and a network are included in the '920 Patent.  (*See* '920 Patent 7:57-9:14; *see also id.* Fig. 1, Fig. 2, & Fig. 8.)

> The present invention also relates to an apparatus for performing the operations herein.  This apparatus may be specially constructed for the required purposes *or it may comprise a general purpose computer* selectively activated or reconfigured by a computer program stored in the computer.

('920 Patent 3:39-44, 3:56-59.)  The '920 Patent is not committed to particular software components or features, nor is there any essential technical set-up for computers or networks involved:

Those skilled in the art will appreciate that RFP management platform may be configured with more or less modules and components to conduct the methods described herein with reference to FIGS. 3-7.  As illustrated in FIGS. 3-7, each of corresponding methods 300, 400, 500, 600 and 700 may be performed by processing logic that may comprise hardware (*e.g.*, circuitry, dedicated logic, programmable logic, microcode, *etc.*), software (such as instructions run on a processing device), or a combination thereof.

(*Id.* 5:14-23.)

This Court concludes that Truveris' method – while perhaps brilliantly conceived[11] – uses general-purpose computers and descriptions of typical web platform interfaces.  The pertinent data sets and sources appear to be commonly known to experts and market-watchers in the prescription drug arena.

> [S]toring, searching, and retrieving data from a database is not a problem specific to computers, but one humans have grappled with for centuries.  * * * The claims at issue here – unlike those in *DDR Holdings* – do not outline a specific way to manipulate the computer to achieve a particular result.  They simply describe in broad and generic terms particular search functions that could be included in a software application.

*Encyclopaedia*, 128 F.Supp.3d at 116 (D.D.C. 2015), *aff'd*, 653 F. App'x 764 (D.C. Cir. 2016) ("We adopt the district court's analysis of the claims under 35 U.S.C. § 101 * * * The claims of the … patents, in contrast, are not directed to improving the functionality of a computer.").

The bulk of Truveris' legal argument in both steps of the *Alice* test relies more on conclusory characterization than it does technologic specifics.  Truveris seems to miss a crucial point.  Just because (i) computer systems or programs are described within a patent, or (ii) a method would be performed on a computer, does *not* necessarily mean that a court will conclude (in step one) that the claim is directed to computer improvements.  One need not look further than *Alice* to recall this point.

---

[11] Even where techniques claimed are "[g]roundbreaking, innovative, or even brilliant," that is not necessarily enough for eligibility under § 101.  *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 591 (2013).

In *Alice*, a computer or software admittedly was used to perform *all* aspects of the claimed method:

> [T]he patents in suit claim (1) the foregoing method for exchanging obligations (the method claims), (2) a computer system configured to carry out the method for exchanging obligations (the system claims), and (3) a computer-readable medium containing program code for performing the method of exchanging obligations (the media claims).  All of the claims are implemented using a computer; the system and media claims expressly recite a computer, and the parties have stipulated that the method claims require a computer as well.

*Alice*, 573 U.S. at 214.  Despite the fact that the method was replete with computer implementation, *still* the Court held that the claims were directed *not* to computer improvement but instead to an abstract economic activity (*i.e.*, of intermediated settlement).  *Id.* at 218. Notwithstanding computer implementation, the Supreme Court concluded that the claims were directed to the abstract concept.  *Id.* at 219 ("*On their face*, the claims before us are drawn to the concept of intermediated settlement, *i.e.*, the use of a third party to mitigate settlement risk.") (emphasis added).  The description of the computer implementation in *Alice* is similar to the description of computer implementation in the '920 Patent.

A software embodiment of Claim 1 would help render or refashion all PBM bids into a uniform scoring framework, which understandably may assist in portraying an 'apples to apples' price/cost comparison.  Economic decision-making improvements may result from arguably better data inputs at particular moments along the proverbial decision tree.  But the method at bottom is not one for improved computer operation; it is a method for improved economic analysis and price comparison.  The end product here really is not improved technology; rather, it is improved market decisions by drug plan sponsors.[12]

---

[12] Indeed, the 'Detailed Description' of the '920 Patent seemingly disavows being tied to any particular technical set-up.  "In the following description, numerous details are set forth.  It will be apparent, however, to one skilled in the art, that the present invention may be practiced without these specific details."  ('920 Patent 3:1-4 (emphasis added).)  If the patentable invention

Truveris likens its invention and patent to *Trading Techs. Int'l, Inc. v. CQG, Inc*., No. 05-CV-4811, 2015 WL 774655, at *4 (N.D. Ill. Feb. 24, 2015), *aff'd*, 675 F. App'x 1001 (Fed. Cir. 2017).  (*See* Doc. No. 21 PageID# 390-91, 393-94.)  However, the comparison of inventions is not apt, and the decision does not bolster Truveris' position.

*Trading Technologies* involved patents on an improved computerized interface through which commodity traders could perform online transactions for an electronic commodities exchange.  The existing commercial market had traders making their trades online, using remote computers.  The patented invention in *Trading Technologies* offered a different, improved user interface for traders.  It enabled remote traders to do their job more effectively because of additional technical capabilities and added functions.  So, the district court concluded that—

> the claims are directed to solving a problem that existed with prior art [user interfaces], namely, that the best bid and best ask prices would change based on updates received from the market.  There was a risk with the prior art [user interfaces] that a trader would miss her intended price as a result of prices changing from under her pointer at the time she clicked on the price cell on the [user interface].  The patents-in-suit provide a system and method whereby traders may place orders at a particular, identified price level, not necessarily the highest bid or the lowest ask price because the invention keeps the prices static in position, and allows the quantities at each price to change.

*Id.* at *4.  What was invented and patented there was an improvement to an existing computer/software technology.  The added functionality was a concrete, discernible improvement.  And so the court concluded that the patent was directed to that technology – not directed to abstract economic activities like participating in an outcry auction pit or performing a commodity trade.

---

is a technological improvement, such as to computer or software function, then one would think that the specific technical details would be essential to embody that invention.  For if that is not so, then it begs the question whether Truveris' patent truly is or is not directed to technical improvement in computer operation.

Importantly, traders who did *not* buy the new invention were *not* shut out from using computers to access the electronic trading market.  Those traders still could do so, albeit with their more mundane user interfaces.  So, what was preempted by the patent in *Trading Technologies* was just the new interface and its added functionality.  The patent did not prevent traders from trading in the market.  More importantly, the patent did not prevent companies using or selling the old, mundane user interfaces from continuing to compete for customers.

Here, as discussed *infra.*, there is a palpable risk that Truveris' '920 Patent would preempt all computerized performance of an RFP for choosing a new PBM.  Truveris says very little about the particulars of its own software and says equally little regarding that of SkySail.

Truveris does not show concrete, specific examples of pre-existing computer programs or functionality – much less any specific points in prior technology where Truveris' method changes those for the better.  There is little in the text of the '920 Patent with regard to gaps in the RFP software market.  The technical discussion in the '920 Patent really does not expose or elaborate on why existing computers and electronic databases cannot suffice for an RFP soliciting PBMs.   TruBid® is *not* described in the Complaint as fixing some outdated existing RFP-conducting software system.  Rather, TruBid® is touted for cost savings through more methodical price-comparison and decision-making.  Never has Truveris described any critical feature of its software.  Never does Truveris show the Court other computer programs (i) where such a feature was missing or (ii) where such a feature was changed in some particular way to render it different and better by the Truveris inventors.  *Cf. Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513-14 (Fed. Cir. 2015) (finding that a specification's disparagement of the prior art is relevant to determine the scope of the invention).

The '920 Patent and USPTO submissions thus fail to show *how* Truveris' method had improved software or cloud platform performance.  For these reasons, Truveris is unlike the patent holder who prevailed in *Trading Technologies*.  Based on a review of the '920 Patent at 7:57 through 9:15, the Court agrees with SkySail's general assessment that the '920 Patent relies on typical computer operations that can be performed from generic, general purpose computers.

Truveris asserted during patent prosecution and again in response to SkySail's motion:

> By obtaining the set of historical drug claims to generate the RFP, the system can use the previously downloaded set of historical drug claims to score the bids more quickly.  This is also a practical application in that it supports the efficiency of the system to obtain the set of historical drug claims during the RFP process and to reuse the same set of historical drug claims to generate the scoring of the bids.  ***This is an advancement to the operation of the computer.***

(Doc. No. 221 PageID# 382, emphasis added by Truveris.)  Respectfully, that is wrong.  This does not describe an improvement to computer operations.  What is described here is a technique to pull information about the customer/sponsor's past drug claims at the outset of the RFP process so that this information can be used at least twice: (i) when drafting the RFP solicitation document; and (ii) when melding PBM bidders' terms and pricing to the anticipated needs of the customer/sponsor, taken from its historical data.  But none of that improves computer operations; rather, what is described is a sensible way to perform commercial activity by pulling data that is useful in two ways and at two junctures.  This may be an improvement of commercial decision-making or economic analysis, but *not* of computer technology.

Truveris also contends that "the invention improves on prior methods by providing an 'unbiased assessment of deal terms and pricing projections, presented on a consistent basis across RFP submissions.'"  (Doc. No. 21 PageID# 3395 (quoting '920 Patent 2:3-8.)  These improvements go to the content of the information considered when making a commercial

decision.  There is no explanation for the computer operation or software feature (if any) improved upon.

The Court therefore concludes that change to computer operation or software features is *not* what the '920 Patent and/or Claim 1 are principally, primarily, or overarchingly directed to.

### c)  Claim 1 would preempt a fundamental economic practice from being conducted using computers.

"At step one of the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a 'fundamental ... practice long prevalent in our system....'"  *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) (quoting *Alice*, 573 U.S. at 219).  If patent claims would preempt the use of a common or fundamental economic practice, this may indicate that those claims really are 'directed to' the abstract concept or commercial practice … rather than being directed to computer improvements or technologic innovation.  Thus, the scope of patent claims *might* shed light on what lies at the heart of those claims.  *Cf. Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*, 128 F.Supp.3d 103, 116 (D.D.C. 2015) ("Even assuming the claims at issue were novel, this does not make them patent-eligible under § 101:  The claims at issue are simply too broad and abstract to meet the requirements for eligibility under § 101 of the Patent Act."), *aff'd*, 653 F. App'x 764 (D.C. Cir. 2016).[13]

> [S]toring, searching, and retrieving data from a database is not a problem specific
> to computers, but one humans have grappled with for centuries.  Furthermore,

---

[13] A narrow claim directed to an abstract idea, however, is not necessarily patent-eligible just because it is narrow.  "While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility."  *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015); *see also OIP Technologies, Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362–63 (Fed. Cir. 2015) ("[T]hat the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract.").

claims must be drawn with enough specificity that they do not preempt every application of the underlying concepts.

*Encyclopaedia*, 128 F.Supp.3d at 116 (D.D.C. 2015), *aff'd*, 653 F. App'x 764 (D.C. Cir. 2016) ("We adopt the district court's analysis of the claims under 35 U.S.C. § 101.").

The breadth of the '920 Patent can be ascertained not only from its text but also from its preemptive impact.  This Court will consider two sources of insight about the scope and effect of the '920 Patent: (i) the New Hampshire RFP, described in the complaint; and (ii) state statutes in New Jersey and elsewhere that reveal (or sometimes mandate) how RFPs for PBMs will be conducted.

### 1.  The State of New Hampshire's Hiring of a Consultant to Conduct a PBM RFP

The Court includes lengthy excerpts from the New Hampshire RFP for two reasons.  First, Truveris included that RFP as an attachment to the complaint, and so it is part of the pleadings.  Second, this RFP provides the Court with an illuminating window into the workings of the pertinent marketplace, *i.e.,* plan sponsors who need to hire consultants to assist in conducting RFPs to choose a new PBM for those sponsors' health benefit plans.

From Truveris' own Exhibit 4 to its complaint, it is apparent that plan sponsors expect consultants to run an RFP for a new prescription drug plan *online*.  (*See* Doc. No. 1-4 PageID# 60 at B.I.)

> The State is seeking proposals to provide technology platform services to assist the State in conducting an online automated reverse auction to support DAS and its authorized representatives in comparing the pricing for its PBM procurement for the State Employee and Retiree Health Benefit Plan. The Contractor must also assist with evaluating the qualifications of PBM bidders and to provide related professional services as described throughout this RFP.

> After conducting a PBM reverse auction, the Bidder must repurpose the reverse auction technology platform to assist the State with ongoing PBM invoice reviews for all invoiced PBM prescription drug claims throughout the life of the State's PBM contract.

If requested by the State, the selected Bidder must also conduct a market check using technology driven evaluation of the incumbent PBM's prescription drug pricing based on benchmark comparators.

(Doc. No. 1-4 PageID# 62.)  "PBM reverse auction means an automated, transparent, and dynamically competitive bidding process conducted online that starts with an opening round of bids and allows qualified PBM bidders to counter-offer a lower price for as many rounds of bidding as determined by the Department of Administrative Services."  (*Id.* PageID# 69.)

A.  MINIMUM QUALIFICATIONS

* * *

2. Bidder's proposed technology platform must have the capacity to perform the following for the PBM reverse auction:

a. Conduct an automated, online, PBM reverse auction;

b. Automate repricing of diverse and complex PBM prescription drug pricing proposals to enable "apples-to-apples" comparisons of the price of PBM bids utilizing 100 percent of annual prescription drug claims data available for state-funded health plans and using code-based classification of drugs from nationally accepted drug sources;

c. Produce an automated report and analysis of PBM bids, including the ranking of PBM bids based on the comparative costs and qualitative aspects thereof within a 48-hour time period following the close of each round of reverse auction bidding; and

d. Perform real-time, electronic, line-by-line, claim-by-claim review of 100 percent of invoiced PBM prescription drug claims, and identify all deviations from specific terms of the PBM services contract resulting from the reverse auction process.

3. Bidder's proposed technology platform used to conduct the PBM reverse auction must have the ability to be repurposed over the duration of the PBM services contract as an automated pharmacy claims adjudication engine to perform real-time, electronic, line-by-line, claim-by-claim review of 100 percent of invoiced PBM prescription drug claims, and identify all deviations from the specific terms of PBM services contracts.

4. Bidder shall not outsource any part of the PBM reverse auction or the automated, real-time, electronic, line-by-line, claim-by-claim review of invoiced PBM prescription drug claims.

5. The Bidder shall not be any of the following: a PBM; a subsidiary or affiliate of a PBM; a company that is managed by a PBM or receives remuneration from a PBM for aggregating clients into a contractual relationship with a PBM.

(Doc. No. 1-4 PageID# 71.)

Reverse Auction Technology Platform

The Contractor shall provide a secure, online platform to host and conduct a PBM reverse auction. The platform shall have the capability to automate repricing of diverse and complex PBM prescription drug pricing proposals to enable direct comparisons of the price of bids using historical claims data from the State.

* * *

PBM Financial Bid Analysis for Each Round of Bidding

The Contractor shall provide a comparative financial analysis report for each round of bidding within 48 hours of the completion of the bidding round. The comparative financial analysis shall include total projected prescription drug costs for each bidding PBM; projected costs before and after guaranteed rebate amounts; dollar and percentage difference from current terms; side-by-side reporting of all proposed pricing components, and all methodologies and assumptions used to develop the financial analysis.

Summary Report of Reverse Auction Results

The Contractor shall provide a comprehensive report after the end of the reverse auction, including a comprehensive financial analysis of bids.

(Doc. No. 1-4 PageID# 74 – 75, bold in original.)

If the Court reads and enforces the '920 Patent as Truveris would have it, then practically speaking there may be no consultant *other than* Truveris (or its licensee) who could perform the mandatory functions demanded by New Hampshire.  That is because the description of the required platform and services from any consultant to be hired by New Hampshire reads remarkably like the elements of Claim 1 of the '920 Patent.

Truveris' complaint drives home this point.  It includes no information about the specifics of SkySail software and no alleged incidents of infringement other than what was gleaned from SkySail's responses to New Hampshire's RFP questions.  SkySail affirmed that it could provide

a platform, software, and services needed to conduct an online auction for selecting a new PBM. And that suffices in Truveris' view to run afoul of the '920 Patent.

The complaint alleges no particular facet of TruBid® software that SkySail might have coopted.  There is no allegation that SkySail software actually does mimic the features or coding of Truveris software.  Indeed, there are no specifics about SkySail software at all; rather, Truveris alleges only what one *might* glean from SkySail's bid responses in New Hampshire and then further infer from those answers about SkySail software's functionality.  That vacuum in the complaint and in Truveris's opposition to the motion to dismiss lends credence to the concern that the '920 Patent is directed to – and is targeting – *not* particular technology but instead the commonplace economic activity of soliciting, evaluating, and comparing bids.

The upshot of this case thus becomes whether Truveris shall have the exclusive right to conduct an online RFP among PBM bidders.  The putative monopoly would not be limited to New Hampshire, as other states allow or even legislatively mandate that government employers only hire PBMs after conducting an online auction-style RFP process.

## 2.  State Laws Directing the Use of Online RFPs for Drug Benefit Plan Selection

Further support for the Court's concerns regarding the scope and consequences of Truveris' position and the '920 Patent comes from matters of public record from various states.

Several states have enacted mandatory procedures for how government units shall solicit, evaluate, and select PBMs.  *E.g.,* La. Stat. Ann. § 39:1600.1; Colo. Rev. Stat. Ann. §§ 24-50-1201, 24-50-1204; Minn. Stat. Ann. § 43A.231; Md. Code Ann., State Pers. & Pens. § 2-502.2. These state statutes expressly require government entities to conduct reverse auction RFPs when selecting a new drug benefit plan or when changing PBM.  These statutes expressly require a vendor to confirm its access to pertinent databases and to confirm its capacity to 'price

normalize' or render different bids sufficiently uniform to allow for accurate and reliable price comparisons.  *See id.*

This trend has found its way to Ohio, where this Court is situated.  For example, on May 6, 2022, the Ohio Bureau of Workers' Compensation (BWC) put out an RFP for a consultant to monitor and audit the pricing and contractual compliance of the agency's PBM.  The agency observed in its RFP:  "Over recent years, PBMs have undergone increased scrutiny due to their inherent lack of transparency.  Therefore, it is critical that BWC accurately and efficiently monitor PBM and rebate vendor compliance with their contractual obligations."  Request for Quotation # BWCB2203 *available at*

https://ohiobuys.ohio.gov/bare.aspx/en/fil/download_public/35715cf0-42a3-4f44-9f9a-266690ab229f (last visited September 7, 2022).

The Ohio agency here solicited the services of a consultant to use industry data to help audit and evaluate the performance of the BWC's current PBM.  That consultant—

> shall conduct analyses of the medication data and drug utilization on a quarterly, annual, and upon request frequency from BWC.  The analyses must include feedback regarding pricing as it relates to other States and data sources and provide [maximum allowable cost] pricing suggestions to BWC.  They must also confirm whether the PBM is meeting the contractual [generic effective rate] and Brand Discount.  . . . The supplier must provide a secure log in for identified BWC staff to this data to allow BWC full insight into these reports.  Lastly, the supplier is required to have a subscription to MediSpan to support drug classification, pricing, drug multisource codes, and brand generic indicators.

*Id.* at p. 2.  Here, we see direct parallels to several of the functions described in the Claim 1 elements.  We see that use of industry data sources to evaluate the PBM's pricing is a technique that naturally occurs in the marketplace – independent and irrespective of whatever method or software that Truveris crafted.

The point of these public developments is simple and follows from the face of the statutes and public records involved.  Several jurisdictions *require* a consultant to conduct an RFP online,

with computers, when soliciting and selecting among PBMs.[14]  They *require* use of market data to project future costs based on historical data.  They *require* translation or standardization of the pricing methods used in various PBMs' proposals.  All of this is expected (if not insisted) to occur.  That software, web-based platforms, or electronic communication are used to conduct such RFPs is not surprising because those tools are used in just about every solicitation, auction, and contract negotiation in today's commerce.

It is unclear whether or how a vendor could be hired as the consultant or RFP manager in these jurisdictions unless that vendor (i) is Truveris itself, (ii) licenses with Truveris, or (iii) will risk a patent infringement lawsuit from Truveris.  Further, Truveris would be able to caution jurisdictions that if they hire a competitor who is arguably infringing upon Claim 1 of the '920 Patent, then the jurisdiction or plan sponsor itself may be complicit in potential patent infringement.

Notably, such risks do not flow from particular software features used by a pharmacy benefit consultant.  The risk follows directly from what these state sponsors require by law.  Consultants assisting in those states to conduct an RFP for a new prescription drug plan *must* perform tasks and services that are *very* similar to Claim 1 elements from the '920 Patent.

In sum, the rules and expectations from New Hampshire and other states – if taken in concert with Truveris' reading and enforcement of the '920 Patent as evidenced in this litigation

---

[14] RFPs are a mainstay for government contracts in particular.  *E.g., CGS-SPP Sec. Joint Venture v. United States*, 158 Fed. Cl. 120, 127 (2022) (resolving a bidder's challenge regarding an emailed bid for a State Department contract where the RFP contained an ambiguity). Increasingly RFP bidding processes occur in electronic formats using online methods of communication – but that phenomenon has been more than twenty years in the making.  *See generally Watterson Const. Co. v. United States,* 98 Fed. Cl. 84, 94-98 (2011) (recounting history of changes from the 1990s onward to RFPS and government procurement to incorporate electronic commerce).

– seem poised to preempt efforts of other consultants to engage in commonplace economic activities such as conducting RFPs online, normalizing different pricing methods, and making 'apples to apples' comparisons of different bids.

These concerns and consequences support the notion that Claim 1 of the '920 Patent is indeed directed to fundamental economic activity – rather than limited to some particular software manifestation or improvement.  The animating concern of the Supreme Court in cases like *Bilski* and *Alice* is thus hovering in this case.  A patent directed to an abstract concept might be wielded to lock up or preclude the use of a common economic practice.  Fundamental economic building blocks are to remain accessible to all – not be reserved exclusively to one.

Because this Court concludes, *supra.*, that Claim 1 of the '920 Patent is directed to an abstract concept, the analysis proceeds further.

### D.    *Alice* Step Two

In step two, the Court must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application.  A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].' … [T]ransformation into a patent-eligible application requires more than simply stating the [abstract idea] while adding the words 'apply it.'

*Alice*, 573 U.S. at 221 (quotations and citations omitted).

### 1.    A Method Directed to Abstract Economic Activity Does Not Transform into Eligible Subject-Matter Merely by Adding General Computer Implementation.

[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.  Stating an abstract idea while adding the words 'apply it' is not enough for patent eligibility.  Nor is limiting the use of an abstract idea to a particular technological environment.  Stating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result.  Thus, if a patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on ... a computer, that addition cannot impart patent eligibility.  This conclusion accords with the pre-emption

> concern that undergirds our § 101 jurisprudence. Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.

*Id.* at 223-24 (quotations and citations omitted).

In *Alice,* the Supreme Court noted that "the claimed method requires the use of a computer to create electronic records, track multiple transactions, and issue simultaneous instructions; in other words, the computer is itself the intermediary." *Id.* at 224 (quotations and citations omitted). However, "the system claims are no different from the method claims in substance. The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea." *Id.* at 226. The Supreme Court thus held the patent claims ineligible in *Alice.*

By contrast, software claims survived in *Enfish* because "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." 822 F.3d at 1336. But "simply adding conventional computer components to well-known business practices" will not suffice. *See Enfish*, 822 F.3d at 1338–39.[15]

---

[15] *E.g., Versata Development Group v. SAP America, Inc.,* 793 F.3d 1306, 1333-34 (Fed. Cir. 2015) (computer performed "purely conventional" steps to carry out claims directed to the "abstract idea of determining a price using organization and product group hierarchies"); *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.,* 811 F.3d 1314, 1324-25 (Fed. Cir. 2016) (claims attaching generic computer components to perform "anonymous loan shopping" not patent eligible); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-69 (Fed. Cir. 2015) (claims adding generic computer components to financial budgeting); *OIP Techs.*, 788 F.3d at 1362-64 (claims implementing offer-based price optimization using conventional computer activities); *buySAFE*, 765 F.3d at 1354–55 (claims adding generic computer functionality to the formation of guaranteed contractual relationships).

### 2.   Truveris' Approach to Step Two

*Alice* instructs that a court must examine the claim elements individually and collectively in order.  *See* 573 U.S. at 221.  Claim 1 of the '920 Patent is the only claim for which the complaint contains an allegation of infringement.  (Doc. No. 1 ¶¶ 11, 30, 48.)

The complaint mentions, but provides no edification regarding, the fifteen elements of Claim 1.  (Doc. No. 1 ¶ 11.)  Truveris' brief does not explain the specific attributes of those claim elements.  (*See* Doc. No. 21 PageID# 396-402.)

Instead, Truveris professes some need for claim construction.  (*Id.* PageID# 400-401.)  However, "claim construction is not an inviolable prerequisite to a validity determination under § 101."  *Bancorp Servs., LLC v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012); *see also Lumen View Tech. LLC v. Findthebest.com, Inc.*, 984 F.Supp.2d 189, 205 (S.D.N.Y. 2013).  In *Bilski* the Supreme Court held that the patent claims were drawn to ineligible subject matter without a claims construction ruling.  561 U.S. at 611-12.

> Here, the claims … are straightforward such that formal claim construction is unnecessary to define or illuminate their content or clarify any uncertain legal determination.  The subject matter of the three patents and their claims is simply a series of generic computer system arrangements for implementing the abstract idea ….  Under any reasonable construction, the claims … are drawn to patent-ineligible subject matter, obviating any need for claim construction.

*Quantum Stream Inc. v. Charter Commc'ns, Inc.*, 309 F.Supp.3d 171, 189 (S.D.N.Y. 2018).

In any event, Truveris does not point out particular claim elements on which the two sides are laboring under different interpretations.  Truveris has not: educated the Court on the particulars of its technology, shown how software such as TruBid embodies the Claim 1 elements, or provided a close textual analysis of the claim elements.  So, it is entirely speculative to suggest that construction of this word or that word amongst the fifteen claim elements would alter the analysis under § 101.

### 3.    Analysis of the Fifteen Process Steps in the Claim 1 Elements

Next the Court will review the fifteen elements in Claim 1 – in search of an inventive concept sufficient to transform the commonplace economic concept to which the patent is generally directed.  The Court is mindful of Truveris' point that both "considering the claims as a whole and accounting for the specific requirements of the claims" is essential.  (Doc. No. 21 PageID# 381.)

**[1-A]**    The first element is "receiving a request to initiate a request for proposal (RFP) process from a particular remote client system of a plurality of remote client systems, the request to initiate the RFP process being for a prescription drug plan for a particular entity."

This activity is straightforward.  A customer uses her computer to access the Truveris platform web interface and to initiate an RFP for selection of a new PBM.  This is a commonplace economic activity, *i.e.,* a customer instructs its consultant to draw up a solicitation of bids from outside vendors.  It is a typical facet of an RFP.  There is no innovation or transformation of the underlying economic activity that results from element 1-A.

**[1-B]**    The next element is "obtaining a particular set of historical drug claims for the particular entity from a remote database."  (Note that this was the element that was moved up to occur earlier in the process when the Truveris inventors submitted their September 4, 2020 amendment to Claim 1.)  These are "historical drug claims of the client who is the subject of the RFP."  (Doc. No. 21-2 at p. 12.)  In the September 4, 2020 amendment to Claim 1, the Truveris inventors explained that their "system receives information pertaining to the client's existing prescription plan including claims data."  (*Id.* at p. 10; *see also* '920 Patent at Fig. 4 step 404.)  This may include "prescription-clams data, formulary data and incumbent PBM data, etc."  (Specification at p. 12 [0032].)

For the particular sponsor/customer who has engaged Truveris to help select a new drug plan, element 1-B gathers data related to that sponsor's drug plan from past years.  This step simply has Truveris' system receiving data from its client (or other repository of data related to the client's drug plan in prior years).

This is a commonplace economic activity that often would occur before or at the outset of many RFPs in many industries.  Suppose a grocery store chain was about to solicit bids for a new produce supplier.  One would expect that before doing so, the grocers would gather data indicating how much they'd spent on fruits and vegetables in prior years.

There is no innovation or transformation of the underlying economic activity that results from element 1-B.  Rather, this element describes straightforward data collection or retrieval.

**[1-C]**     The next element is "generating an RFP for the particular entity for the prescription drug plan based on the particular set of historical drug claims obtained from the remote database."  There are two salient features of this element: (i) drafting the RFP, and (ii) incorporating the sponsor's historical drug claim data.

Element 1-C involves the drafting of the document or electronic medium that solicits bids from PBMs, which will be published or distributed to PBM vendors.  That is referred to as 'generating an RFP.'  A client must approve the RFP before it is circulated.  (*See* Specification at p. 13 [0032].)  This is a commonplace economic activity that always will occur before an RFP is made public, *i.e.,* drafting the solicitation itself.

The second facet of element 1-C is that the request or solicitation will be 'based on' the client's historical drug claim data.  This is a commonplace economic activity that would likely occur as part of crafting just about any RFP, *i.e.,* (i) consider the client's experience and

expenditures with its existing or past vendor(s), in order to (ii) inform the solicitation for a replacement vendor.

Consider again the example of the grocery store chain looking to hire a new produce supplier, which reviews its own past produce needs and spending.  There is nothing surprising or innovative if the grocers use their own past produce spending when crafting the RFP for a new produce supplier.  Indeed, it would be surprising if the grocers did *not* do so.  A customer considering a new supplier or service provider always will consider how much of its own financial books and records, including detail of its own past deals with vendors, to reveal to potential new vendors.  RFPs are not used to elicit vendors' generic price lists; rather, RFPs encourage bidders to craft proposals tailored specifically to the customer's particular situation and needs.  And like a party game of limbo, the customer's past expenditures may operate as the bar, with the RFP asking bidders: How low can you go?

Although element 1-C refers to historical drug claim data, the '920 Patent acknowledges that a cluster of different data points and client preferences all get 'baked in' to an RFP.

> Method may receive a variety of information pertaining to client's existing prescription drug plan (*e.g.*, prescription-claims data, formulary data and incumbent PBM data, etc.), client conditions for PBM participation, client preferences for bidding time frames and scoring of bids received, distribution of the RFP to select PBMs and any other information relevant to generating the RFP and enabling bidding thereon.

('920 Patent 6:10-17.)  This language reveals that an RFP is not being generated automatically from the received historical drug claim data.  Rather, the latter data is just one of multiple inputs considered and incorporated when putting together the RFP.

This is commonplace economic activity, *i.e.,* a client sharing with the consultant who will run an RFP information about the client's past experience and preferences.  Although data is

used, that use is rather basic and cannot be described as transformative.[16]  There is no innovation

or transformation of typical underlying economic activity that results from element 1-C.  Rather,

this element describes a consultant's use or application of a client's data.  It is common sense

that RFPs for a new vendor are crafted using results and past performance from past vendors.

**[1-D]**     The next element is "distributing said RFP to a plurality of remote pharmacy

benefit manager (PBM) systems to participate in submission of a bid in response to said RFP."

This step describes nothing more than publishing or distributing the solicitation of bids to

multiple vendors in the market.

This is commonplace economic activity, *i.e.,* one cannot solicit bids without actually

publishing or circulating the RFP itself.  There is no innovation or transformation of typical

underlying economic activity that results from element 1-D.

**[1-E]**     The next element is "receiving an electronic confirmation from one or more of

said plurality of remote PBM systems acknowledging participation in said RFP."

This step is a simple, almost ministerial action performed by a would-be bidder.  If a PBM

wishes to participate in the RFP process, that PBM must give some indication of that.  Here, the

expression of interest from a bidder is communicated electronically, possibly by email and more

likely by using Truveris' web platform.

This is commonplace economic activity, *i.e.,* receiving indications of interest from potential

vendor-bidders.  There is no innovation or transformation of typical underlying economic

activity that results from element 1-E.

---

[16] It is not clear how much, if any, of the client's historical drug claim data can be shared
with PBM bidders, in light of HIPAA laws.  (*See* Doc. No. 21-2 at p. 13.)

**[1-F]**      The next element is "receiving one or more bids containing pricing information and contract terms from the one or more of said plurality of remote PBM systems having acknowledged participation, the pricing information comprising respective pricing terms corresponding to one or more drug claims, the one or more bids each including a corresponding PBM-indicated drug classification for each drug claim of the one or more drug claims."

This step, like the prior one, entails the receipt of information from a bidder.  But here the communicated information is far more robust.  This is receipt of the actual bid, with proposed contract terms and proposed prices.  In the PBM context, a bid will offer terms for a prescription drug benefit plan for the RFP-sponsor.

Truveris did not provide much description of its software.  This Court has examined the exhibit to the complaint, which appears to show the web-based module that PBM bidders use to generate and submit their bids in Truveris' platform.  (*See* Doc. No. 1-7 PageID# 133-136.)

The Court acknowledges that the Truveris platform may provide a unique web window for inputting the details of a PBM's bid.  While the pull-down menus, form fields, and categories for inputting a bid may be useful, none of those changes the fundamental character of the economic activity.  PBMs submitting bids in response to RFPs is neither new nor rare – which the '920 Patent expressly concedes.  ('920 Patent 1:22-2:8.)  That a bidder must input particular facets into different computer screen fields (*e.g.,* drug category, drug price, discount rate, *etc.*) is not fundamentally different than a paper submission where the RFP required a bidder to tease out such aspects on different pages or using specified headings.

Element 1-F refers to a conventional, commonplace economic activity, *i.e.*, submission of a bid by a PBM with the terms for an offered prescription drug benefit plan.  The patent text, Truveris' arguments, and the USPTO submissions do not indicate an inventive concept with

respect to element 1-F or a transformative effect therefrom.  The computer and platform are used to implement a common activity: communicating a bidder's offered terms.

[1-G]     The '920 Patent refers at the outset to using a "subscription to third party data services for clinical and pricing classification data required to calculate pharmacy claims cost." ('920 Patent 1:43-46.)  The next element described in Claim 1 is "obtaining, from one or more third party systems, data indicators indicating third-party-indicated drug classifications for the historical drug claims of the particular set of historical drug claims, the third-party-indicated drug classifications including a generic drug classification, a brand drug classification, and a specialty drug classification, the third party systems being different than the remote database, the particular remote client system and the plurality of PBM systems."[17]

The action in this step is to obtain third-party data regarding the spectrum of various prescription drugs, including classifications or categories for those drugs.  It is common for prescription drug benefit plans to categorize drugs as generic, brand name, and specialty – each of which typically has its own rules or percentage of cost that will be covered.  For example, a PBM's plan may require that 'specialty' drugs only be obtained from a mail-order specialty pharmacy.

Because the data comes from third-party sources of information regarding drug classification and pricing in the market, presumably this step could be performed before, during, or after the other steps thus far discussed.  There does not appear to be any significance to when this step is performed, except:  it makes sense that in an earlier step, [1-B], Truveris obtains data regarding the client's historical drug claim costs.  Then in this later step, [1-G], perhaps Truveris

---

[17] This data will be used in the next step, [1-H], for "division of drug claims into brand, generic, and specialty drug classifications utilizing data indicators provided by third party data sources (*e.g.*, licensed industry databases)."  ('920 Patent 7:6-9.)

gathers drug categories from industry sources with an eye toward what categorization scheme might be best to employ for this particular client's situation.  That is just a speculative inference, to give Truveris the benefit of the doubt.

This step does not indicate how the data is obtained or received.  Presumably Truveris or the customer must purchase the data from the third-party who compiled it.  If so, Truveris may hold a subscription.  There is no indication of any automated functionality or innovative means of obtaining the data.  Also, there is not specification of the form such data may take.  This step therefore could be directed to be purchasing rights to an online repository of data or perhaps even ordering some bound paper compendium of market research.

A fair reading of this step is that it is nothing more than pulling from some third party their particular way of grouping, classifying, or ranking various prescription drugs.  This step just borrows the taxonomy prepared by a third party.  From the text of the patent, the idea is to pick a scheme that is different for difference's sake.  Presumably the point is to select a neutral scheme, *i.e.,* classes that do not depend on however the bidders happened to divvy up categories in the bids.

A final note regarding this step: it is not clear that it would be necessary each time the method is used.  If Truveris finds some third-party drug classification schema that seems well-organized and wisely construed, it seems conceivable that Truveris could use this same third-party template any time Truveris was hired to conduct an RFP.  In other words, once Truveris in its expertise selects a neutral or a model classification scheme, it would be expected and seem sensible for Truveris to employ this scheme again.  If that were so, then this is no longer an essential step that need be performed each time for each RFP.  Regardless of whether that does

or does not occur, the Court's analysis would be the same. So, for purposes of this opinion, the Court presumes that this step is performed every time the method is used.

This step is directed to an abstract idea and involves a basic, ubiquitous task among market actors including customers and consultants: performing market research. Specifically, this step researches how sources in the industry categorize or group particular classes and brands of drugs. There is no innovation or transformation indicated by this step; rather, the point seems to be to borrow a set of drug categories from data compiled by industry experts.

**[1-H]** The next element in Claim 1 is "classifying each historical drug claim of the particular set of historical drug claims into one or more third-party-indicated drug classifications of the third-party-indicated drug classifications based on the data indicators, the classifying disregarding the corresponding PBM-indicated drug classification."

In this step Truveris merely sheds all the labels and categories used by the customer and by bidders. The drug claims data in the customer's history and in the bidders' respective proposals are now re-classified using the groupings and categories taken from the third-party data source in the prior step, [1-G].

In every industry, differences in pricing classes and categories used by different providers requires every customer to take into account each provider's unique way of cataloging and pricing particular goods or services. So, this activity is a common one when comparing offers: *i.e.,* strip away the labels used by different competitors and drill down to specific goods and services in order to get to an objective measure of the pricing being offered by each.

The need here is not unique to prescription drugs or PBMs. Commercial customers regularly must 'look behind' a vendor's promoted pricing to ascertain how the vendor's categories and price thresholds would 'map onto' to the customer's actual need … and then

gauge the impact on the customer's overall costs.  When evaluating more than one vendor, a customer almost aways will have to account for the details and differences in each vendor's array of pricing plans.

This step involves a common, often necessary, task: *i.e.,* applying new headings, identifiers, or categories to an existing data set.  Another way to categorize the activity here is taking multiple data sets and applying some common framework to each.  The dynamic here could be labeled translation, normalization, re-categorization, etc.  However labeled, the activity is both abstract and commonplace.

There is no innovation or transformation of typical underlying economic activity that results from element 1-H.  Note that the recategorization occurring in this step might be described as repackaging or transforming *the data*, but there is no transformation of the underlying economic activity and abstract concept in play in this element.

**[1-I]**     The next step in Claim 1 is "obtaining, from the one or more third-party systems, price inflation parameters and utilization inflation parameters for each third-party-indicated drug classification of the one or more third-party-indicated drug classifications."[18]

This step is similar to a prior step, [1-G], which obtains from a third party a classification scheme for prescription drugs.  Here, information regarding inflation and its effect on drug pricing and utilization also is obtained from a third party data source.  Much of what was discussed above as to element [1-G] likewise applies to this step.

---

[18] "For each year of a projection, an inflation percentage may be applied to a claim set based upon division of drug claims into brand, generic, and specialty drug classifications utilizing data indicators provided by third party data sources (*e.g.,* licensed industry databases).  ('920 Patent 7:6-10.)

This step is directed to an abstract idea and involves a basic, ubiquitous task among market actors including customers and consultants: performing market research.  Specifically, this step researches how inflation affects or will affect in the future the particular categories prescription drug claims.  The categories and the inflation information are both pulled from third-party data sources, *i.e.,* market experts.  There is no innovation or transformation indicated by this step; rather, the point seems to be to borrow a set of inflation parameters from data compiled by industry experts.

**[1-J]**      The next step is "obtaining historical utilization data associated with the particular set of historical drug claims."

This element appears related to a prior step, [1-B], where historical drug claims data was obtained.  The Court does not discuss this element at length because neither the '920 Patent text nor the USPTO documents elaborate on why this step (i) is distinct from element [1-B], or (ii) why this obtaining of historical utilization data occurs several steps removed from obtaining the historical drug claims data in element [1-B].[19]

Borrowing from the earlier grocery store chain analogy, the grocers putting out an RFP not only would look at how much produce historically they bought from past suppliers, the grocers also would look at historically how much produce their stores actually sold.  That is akin to the dynamic here, where Truveris is obtaining not only historical drug claims data but also historical utilization data.

---

[19] The text of a subsequent element seems to confirm the Court's reading that information obtained in elements [1-B] and [1-J] are related:  element [1-K] refers to "applying the utilization inflation parameters to the historical utilization data associated with the particular set of historical drug claims."  ('920 Patent 10:4-6.)

For present purposes of *Alice* step two, it suffices to say:  This is a commonplace economic activity that often would occur before or at the outset of many RFPs in many industries.  A customer may pull data showing historical spending and utilization trends.  There is no innovation or transformation of the underlying economic activity that results from element 1-J.  Rather, this element describes straightforward data collection or retrieval.

The next four elements [1-K] through [1-N] together comprise "an adjudication process … for bids received from participating PBMs.  The adjudication process, which is described in additional detail with reference to method 600 illustrated in FIG. 6, may allow the standardization of bids received across the pool of participating PBMs.  FIG. 6 is a flow diagram illustrating a method for implementing an adjudication process, according to an embodiment of the invention."  ('920 Patent 6:52-61; *see also id.* PageID# 40 (containing the Figure 6 graphical representation of the adjudication process to compare bids).)  Recall that the '920 Patent described the difficulty in quickly, fairly, and accurately comparing PBM bids and pricing.  (*See id.* 1:25-2:8.)  If there is ingenuity to be found in Claim 1, then, the adjudication process in elements [1-K] through [1-N] would be the likeliest spot.

**[1-K]**     The next element is "using the particular set of historical drug claims from the remote database to project costs forward by applying the price inflation parameters to the pricing information of each bid of said one or more bids based on the one or more third-party-indicated drug classifications, and applying the utilization inflation parameters to the historical utilization data associated with the particular set of historical drug claims."[20]

_____

[20] This step operates in tandem (and overlaps) with the immediately following step, [1-L], which reads: "calculating a corresponding estimated plan cost for each bid of the one or more bids based on the projecting costs forward, the corresponding estimated plan cost of each bid of the one or more bids having accounted for price inflation and utilization inflation based on the

In this step, "related client data from a prior period (the same data provided to a participating PBM in constructing a bid) is retrieved … and projected forward (*i.e.*, inflated) for a specified period of time – *e.g.,* three (3) years.  Forward projections may be based upon configurable parameters set separately for each of the three (3) projection years."  ('920 Patent 6:66-7:5; *see also id.* Figure 6 at block 606.)

Element [1-K] involves a quintessential, abstract economic activity, *i.e.,* using a customer's past demand and past expenditures to project its anticipated future costs.  Here, data from the customer's past drug claims is used to project costs going forward for three years.  This step applies price inflation parameters and utilization parameters.  That sort of projection is "a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class."  *Bilski*, 561 U.S. at 611.

**[1-L]**   The next element is "calculating a corresponding estimated plan cost for each bid of the one or more bids based on the projecting costs forward, the corresponding estimated plan cost of each bid of the one or more bids having accounted for price inflation and utilization inflation based on the same price inflation parameters, the same utilization inflation parameters, and the same third-party-indicated drug classifications."

The '920 Patent specifies what occurs in this element:

> For each year of a projection, an inflation percentage may be applied to a claim set based upon division of drug claims into brand, generic, and specialty drug classifications utilizing data indicators provided by third party data sources (*e.g.,* licensed industry databases).  Drug classification may be determined on a claim by claim basis using a custom configured algorithm in order to ensure that inflation is applied consistently across all PBM bids, regardless of the PBM drug classification terms selected.  For each classification type (brand, generic, and specialty) and each year of the projection, a stored percentage value may be applied, indicating the utilization inflation percentage and price inflation percentage.  As a result, drug

---

same price inflation parameters, the same utilization inflation parameters, and the same third-party-indicated drug classifications."

> spend may be uniformly applied across all PBM bids, but specific to the drug mix and claims contained in the RFP claims data.
>
> Thereafter, estimated plan costs for the projected client data may be calculated … based on the pricing and definitions provided in the bid scenario and presented … to the PBM for review.  If the PBM is satisfied with the estimated costs associated with the bid scenario, the bid may be submitted as the PBM's bid to undergo a scoring process.

('920 Patent 7:6-27.)  Here, the process takes the future costs and anticipated demand of the sponsor/customer and maps that projection onto each of the several bid submissions from PBMs. In addition, the third-party-indicated drug classifications borrowed from industry norms and data also are applied to each bidder's proposal.

The Court appreciates that a good deal of industry-specific data is utilized in this step. Further, given the size and complexity of such data, use of a computer and software likely seem a given in today's technological environment.  What once were computations performed by humans still might be amenable to an abacus, but no one seriously expects commercial actors to forego the speed and functionality that comes with computers, spreadsheet software, and the like.

Yet here, too – even when computer-implemented – what we have is "a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." *Bilski*, 561 U.S. at 611.  This element melds customer-specific needs and projections with the proposed pricing and terms from each bidder.  Here, the method 'drops out' drug categories used by each of the respective bidders in favor of one uniform set of drug categories drawn from industry data.  This is done to help standardize the bids and make the pricing easier for comparison.   But that dynamic is not one unique to drug plans or PBMs.  In any RFP, the customer (or its professionals) must find a way to 'see past' the differences in unique price tags or categorizes used by various bidders.

There is no indication in the '920 Patent of any creative new way to conceive of projections, and even if there was, that still would be ineligible subject-matter in the form of economics. Moreover, there is nothing in the '920 Patent to show *the limits* of a claim on software that would perform the steps in elements [1-J], [1-K], and [1-L].  That is because there are not specifics for how precisely software would incorporate historical data, apply inflation parameters, gauge price, or compute projections.  The upshot is that designing and/or using software to compute or project costs forward for prescription drugs plans would seem to run afoul of these elements *regardless of* the particulars in a purported infringer's software.

Therein lies a recurring problem.  The specifics of implementing software are not found in the '920 Patent, the Complaint, or the motion papers.  That leaves little basis for the Court to depart from its conclusion in step one that Claim 1 is directed to an abstract economic concept. Moreover, it makes it nearly impossible to identify 'additional features' that suffice to transform the abstract concept.  Note that the '920 Patent *does* describe features in the form of *substantive content* (*e.g.*, types of data) and *market decision-making* (*e.g.,* how to compute projections or how to compute normalized prices for several bids).  Those would be additional features or ingenuity directed to abstract economic practices.  What is lacking are express limits on (or edification of) additional *computer or software* features that are sufficiently transformative of the underlying abstract concept.

**[1-M]**     The next element is "calculating a contract terms cost for the contract terms of each bid of the one or more bids."

In the prior step, [1-L], uniform drug categories and projections were applied to each bid in an effort to 'normalize' them for a 'apples-to-apples' comparison.  However, this step folds in unique adjustments to cost based on contract terms peculiar to each bid and bidder.

61

This step applies a pure abstract economic idea, *i.e.*, using a contract's terms to calculate that contract's effective pricing or cost.[21]  This is not unique to PBMs or drug plans; rather, it is commonplace that a contract may contain particular definitions, return policies, rules or handling disputes, *etc*.  It is equally typical for commercial actors to attempt to quantify the effect of contract terms.  Element [1-M] does not have a transformative effect.

**[1-N]**      The next element is "generating scores for each bid of said one or more bids based on the corresponding estimated plan cost and on the contract terms cost."  The '920 Patent elaborates on this step:

> FIG. 7 is a flow diagram illustrating a method for implementing a scoring process, according to an embodiment of the invention.  Referring to FIG. 7, method may be initiated upon receiving … an indication to execute a scoring process for a submitted bid to an RFP received from a participating PBM.  In implementing the scoring process, method … may calculate weighted scores associated with costs of a plan….  Weighted scores associated with contract terms and definitions of a plan may be calculated …, or weighted scores associated with any other category of a plan submitted in the bid by the participating PBM may be calculated.  Scores calculated for one or more categories of the plan may then be used to determine … a total score for the plan.  The total score for the plan may be presented for

---

[21] To understand this element, consider again the example of grocers trying to choose among various produce suppliers.  Vendors each have different contract terms for returns of browned, rotting, or bug-eaten produce.  Supplier *A*'s rule is that any portion of produce deliveries may be returned by a grocery store for a 100% cash refund – so long as the return is completed within 24 hours of delivery.  Supplier *B*'s rule is that any portion of produce deliveries may be returned by a grocery store for a 90% cash refund – so long as the return is completed within 48 hours of delivery.  Supplier C's rule is that any portion of produce deliveries may be returned by a grocery store for an account credit, which may be applied to future orders – so long as the return is completed within 72 hours of delivery.   To decide between *A* and *B*, grocers will need to consider whether it is worthwhile to sacrifice 10% in returned cash, which itself depends on how many orders are projected to require return after longer than 24 hours.  The question to be quantified is, for these grocer-customers, whether the 10% difference in cash refund is worth more or less than the number of returns that otherwise would be sacrificed because they will likely to occur more than 24 hours after delivery.  Finally, grocers might prefer *C* because (i) understaffed stores need more than 48 hours to complete their returns and/or (ii) the repeat nature of the relationship with the produce supplier makes the cash-versus-account-credit distinction functionally unimportant.  The point here is that for most RFPs, pricing policies and contract terms often will be (i) quantified for each bid, as well as (ii) standardized or framed in some uniform fashion among the several bids for comparison purposes.

consideration to the client originating the RFP …. In calculating a score for a particular category of the plan, multiple factors underlying the category may be taken into consideration. For example, in calculating a score for the terms and definitions category of the plan, factors relating to agreement and/or disagreement of definitions, PBM services offered, audit and bill review, term and termination of the plan, confidentiality elements, technical definitions of drug pricing classifications, specific pricing discounts, performance guarantees and any other applicable measure may be taken into consideration and assigned a weighted score as a percentage of a total score possible for the category. Scoring percentages and weights may be predefined via administrative settings or be subject to client preferences.

('920 Patent 7:28-56, block citations omitted.)

Assigning scores to bids submitted in response to an RFP is a typical practice in the economy. In their evaluation after receiving bids, a customer and/or its consultant will assign values, percentages, or 'points' to specific responses from a bidder or to particular topics of emphasis. (*E.g.,* Doc. No. 1-4 PageID# 68-69.)

This step is directed to an abstract idea and involves a common type of process that occurs in an RFP after bids have been submitted. There may be innovation or transformation that occurs here, but those are directed to the content of the submissions and the economic evaluation of those. There is nothing in the '920 Patent or Truveris' submissions that indicates technological innovation or improvement in how bids are quantified, scored, and compared.

**[1-O]** The last element is "sending at least one bid of the one or more bids and at least one score of the scores to said particular remote client system to support selection of the drug prescription plan from the one or more bids."

This step involves nothing more than transmitting to the client's computer the details from the particular PBM bid that was selected as the winner of the RFP. There is no inventive concept or transformation indicated by this element [1-O].

### 4.    Consideration of the Elements as Ordered Steps

The first six elements [1-A] through [1-F] cover the creation of an RFP and receipt of bids in response thereto.  Each of these steps involves basic aspects of what is a very common activity that occurs in the free market, *i.e.*, soliciting bids from suppliers or service providers.  Together, these elements entail commonplace commercial activity.  Admittedly the contemplated software may allow such activity to be performed on a computer, making it easier or faster.  By requiring PBM bidders to input their proposals using form fields and pivot tables in the Truveris platform, it stands to reason that Truveris or its customer might then have the ability to manipulate the bidder's information more easily.  But this Court cannot conclude that such functionality transforms what is otherwise an abstract concept in the form of traditional, widespread commercial activity typical of an RFP.  In short, nothing in the claim description or specification thus far shows transformation that would suffice to overcome the problem that these elements are directed to a fundamental building block of the economy.

That said, Truveris' assertion of ingenuity focused on how it can analyze and present the bidders' respective information to enable better 'apples to apples' comparison.  In fairness, then, the more significant claim elements presumably are those that come *after* receipt of bids from PBMs – *i.e.,* when Truveris brings to bear its experience and improvements to the process.

There are two relevant sequences of steps.  First, elements [1-G] through [1-J] involve data retrieval and data selection.  These steps pull information that will be used to standardize the bids in a common framework and to price normalize the bids for more reliable comparison.  For two reasons, the Court does not find this sequence of elements to be transformative.  There is no indication that (i) particular data points or data sources used are unique or innovative, or (ii) any innovative software design or distinct computer operation occurs.

Nothing in the first ten (10) elements [1-A] through [1-J] indicates an inventive concept sufficient under step two to sufficiently recast or transform the underlying activity.  These steps all boil down to data selection, data retrieval, data reclassification, and data application.  Within these elements, considered individually or taken together, the underlying activity is commonplace.  A customer about to issue an RFP will analyze its own historical costs, utilization, and prices paid to vendors.  A customer once in receipt of several bids, where each bidder appears to use different categories for the same sorts of products, might decide to use some common set of categories to group the different products – *i.e.,* rather than selecting the categories used by any one particular bidder.  Although the data sources here are industry-specific for pharmaceuticals and prescription drug plans, *the type* of information being culled in this method seems like exactly what one would expect a customer to gather and consider before choosing a vendor and entering into a high-cost, multiyear contract.  These are fundamental building blocks of the economy, which would occur frequently in the RFP process.

Further, the computer operations or software functions to achieve these ten steps in elements [1-A] through [1-J] seem very pedestrian.  Nowhere do the claim elements up to this point indicate that computers or software will be able to do something that otherwise or beforehand they could not.  For *every* web-based platform, a designer can select which fields or inputs should be populated by particular users.  And any industry-specific consultant will typically subscribe to – and make available to consulting clients – data from subscription services or from industry experts.  Nothing as yet strikes the Court as transformational.  The first ten elements do not change (or even mask) the underlying abstract economic activity at work

A second sequence of note comes in elements [1-K] through [1-N], which is the adjudication process by which PBM bids are repackaged and standardized using the data obtained in the prior

sequence.  The bids are price normalized and translated into projected future costs.  For two

reasons, the Court does not find this sequence of elements to be transformative.  First, there is no

indication that the scoring method, the inflation calculation, the projection methods, or the

particular data sets used in each are unique or innovative.  Second, there is no indication of

innovative software design or distinct computer operation at work.

The Court does recognize that these later steps in the method may prove useful to Truveris

customers.  But there does not appear to be *technological* or *computer operational* innovation at

work.  For any RFP conducted today, it makes sense to require bidders to input certain of their

data, pricing methods, or contract terms using particular form fields or pivot tables in the

platform used to conduct the RFP.  That is sensible because it enables a customer or consultant to

more readily pull or compare particular facets of the various bids. But nothing in the '920 Patent

indicates how the Truveris platform adds functions that are different from or improvements over

platform software designed generally for RFPs.  Moreover, there is nary a description of

particular software on which Truveris claims to have improved, nor is there any explanation as to

particular SkySail software features that purportedly infringe.

### 5.    Other Claims in the '920 Patent

Truveris never argued that SkySail infringed a claim other than Claim 1.  Moreover,

Truveris did not argue that a proper understanding of the '920 Patent required consideration of

claims other than Claim 1.  *Cf. Berkheimer v. HP Inc*., 881 F.3d 1360, 1365 (Fed. Cir. 2018)

("Courts may treat a claim as representative in certain situations, such as if the patentee does not

present any meaningful argument for the distinctive significance of any claim limitations not

found in the representative claim or if the parties agree to treat a claim as representative.").

Truveris does, however, mention Claim 4 of the '920 Patent as supplying an inventive, unconventional concept.  (*See* Doc. No. 21 PageID# 398.)  Claim 4 provides:

> 4.  The computer-implemented method of claim 1, wherein scoring each of said one or more bids comprises at least two scoring elements, wherein a first scoring element is associated with plan costs and a second scoring element is associated with plan terms and definitions.

('920 Patent 10:32-36.)

Three points undercut the significance of Claim 4.  First, SkySail is not alleged to have infringed upon Claim 4.  Second, Claim 4 does not bespeak ingenuity.  It distinguishes two ways of scoring a bid and contemplates a process where both of those scores would be considered. The first score focuses on costs, while the second score focuses on the impact of the bidder's plan definitions and contract terms.

Third, it is difficult to see how Claim 4 adds much to the Claim 1 process.  According to Claim 1 element [1-L], a plan cost for each bid is computed.  Claim 1 element [1-M] calculates the cost of particular contract terms in each bid.  Claim 1 element [1-N] scores each bid "based on the corresponding estimated plan cost *and* on the contract terms cost."  ('920 Patent 10:18-20, emphasis added.)  Claim 4 thus does not add much to what is otherwise described in Claim 1 at elements [1-L] through [1-N].[22]

### 6.     Claims Construction Is Not Warranted

Truveris argues "that the parties *may* disagree about claim meaning and those disputes *may* bear on the Court's analysis of inventive concept under *Alice* step two."  (Doc. No. 21 PageID# 400, emphasis added.)

---

[22] Truveris alludes to "portions of claims 1, 11, and 12 that require, *inter alia,* 'using historical drug claims….'"  Claims 11 and 12 do not alter the Court's analysis because they do not utilize historical drug claims data in some different manner than Claim 1.

As examples only, the Court may need to construe "remote database," "remote PBM systems," or "price inflation parameters" or potentially other terms before determining whether such elements were conventional.  Accordingly, the Court should, at a minimum, deny SkySail's motion as premature in light of the potential need to construe asserted claim elements.

(*Id.* PageID# 401.)

If Truveris contends that SkySail's motion relied on erroneous claim definitions, then Truveris ought to have pointed out where that occurs and why it was wrong.  If Truveris felt that a proper evaluation of Claim 1 under § 101 depends on some particular construction, then it was incumbent upon Truveris to say what that construction is.  Pointing to conceivable, theoretical claims construction disputes is inadequate.

Truveris cites rather weak examples of terms in supposed need of construction.  Plainly "remote PBM systems" refers to the computers used by each PBM bidder, from which they interface with Truveris' RFP platform.  Plainly a "remote database" would refer to some repository of data that is located away from the Truveris platform itself, and presumably such would be accessed via a network connection.  As for "price inflation parameters," admittedly those could be understood differently depending on the content of the factors employed or the particular equations or algorithms selected.  But those differences would not change the outcome of the Court's analysis because they go to how an economic projection is computed and carried out.  It would not matter how the price inflation parameters worked for present purposes because those do not indicate an improvement to computer operation.  At best, those might point to improvements in economic practices (*i.e.,* abstract ideas), which are not eligible for protection under § 101.

This case is unlike *MyMail, Ltd. v. ooVoo, LLC*, where the patent-holder opposed a motion for judgment on the pleadings specifically on the ground "that the claimed inventions are patent eligible, as evidenced in part by a construction of the term 'toolbar' rendered by the Eastern

68

District of Texas in an earlier proceeding involving the [same] patent." 934 F.3d 1373, 1376 (Fed. Cir. 2019). Unlike *MyMail*, here Truveris does not rely on some particular construction of a portion of Claim 1. (*See* Doc. No. 21 PageID# 383 n.2.) In fact, Truveris' brief never identifies *any* particular term or phrase that was construed improperly by SkySail.

Finally, Truveris relies on *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018), which came to the Federal Circuit from a district court's resolution of a summary judgment motion. Truveris selectively quotes from *Berkheimer* for the proposition the question of whether a claim element is well-understood, routine, or conventional in the field is normally a question of fact. (*See* Doc. No. 21 PageID# 383.) Truveris' position, as articulated throughout its brief, would make it nearly impossible for a court to dismiss a patent infringement claim under § 101 because it would be impossible to gauge *Alice* step two. It is crucial to point out the discussion in *Berkheimer* that Truveris omits:

> [W]hether a claim recites patent eligible subject matter is a question of law which *may* contain underlying facts. We have previously stated that the § 101 inquiry *may* contain underlying factual issues. And the Supreme Court recognized that in making the § 101 determination, the inquiry *might sometimes* overlap with other fact-intensive inquiries like novelty under § 102.
>
> As our cases demonstrate, *not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry*. Whether a claim recites patent eligible subject matter is a question of law which *may* contain disputes over underlying facts. *Patent eligibility has in many cases been resolved on motions to dismiss* or summary judgment. Nothing in this decision should be viewed as casting doubt on the propriety of those cases.

*Berkheimer*, 881 F.3d at 1368 (citations and quotations omitted; emphases added).

### 7.    Step Two Legal Conclusions

From its review, the Court does not discern what Truveris admitted was a crucial criterion, *i.e.,* 'specific improvements in computer technology.' (*See* Doc. No. 21 PageID# 380.) At each turn of the elements, both individually and as ordered sequences, the Court sees typical

commercial activities and commonplace ways of computing financial projections and reaching economic conclusions.  Claim 1 of the '920 Patent is akin to the claims considered in *Bilski* and *Alice*, which were both computer-implemented methods.  In those cases and here, it was the fundamental economic activity and abstract concepts that stood above all the technical discussion.  In those cases and here, a patent on the method preempts use of fundamental economic methods – not just particular technological features or functions.

The following excerpt thus makes for an apt description of Claim 1 of the '920 Patent:

> [E]valuating these claimed elements either individually or as an ordered combination, we conclude that they recite no more than routine steps of data collection and organization using generic computer components and conventional computer data processing activities.  * * *

> [T]he claims recite nothing inventive or transformative…. Thus, taken individually or in combination, the recited limitations neither improve the functions of the computer itself, nor provide specific programming, tailored software, or meaningful guidance for implementing the abstract concept.  Accordingly, they do not meaningfully limit the claims to provide the requisite inventive concept under step two.

*Intell. Ventures I LLC v. Cap. One Fin. Corp*., 850 F.3d 1332, 1342 (Fed. Cir. 2017) (citation omitted).

If ingenuity is embedded in the fifteen ordered steps of Claim 1, it is directed to how PBM bids and pricing should be translated and rendered uniform to facilitate wiser, more reliable price comparison.  Such improvement runs to the content of decisions in selecting a new PBM.  Those may well be deemed innovation as a matter of business acumen or economics.  But there are no specifics from which one reasonably can characterize the '920 Patent as being primarily, or on the whole, directed to specific improvements in computer function, software design, or electronic technology.  Moreover, the computer and technology operations described in the '920 Patent are generic.  (*See* '920 Patent 7:57-9:15.)  They do not reveal additional features transformative of what ultimately remains a patent focused on commonplace, abstract economic activity.

For that reason, the Court concludes under *Alice* step two that Claim 1 of the '920 Patent does not contain the 'something more' sufficient to transform the abstract idea to which the claim is directed.  The subject matter in Claim 1 therefore is ineligible for patent protection under § 101.[23]

## II.    Induced Infringement

The Complaint alleges:  "On information and belief, SkySail infringes or induces … the infringement of at least claim 1 of the '920 Patent…."  (Doc. No. 1 ¶ 30.)

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).  "However, knowledge of the acts alleged to constitute infringement is not enough." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (*en banc*) (citations omitted).  "In contrast to direct infringement, liability for inducing infringement attaches only if the defendant knew of the patent and that 'the induced acts constitute patent infringement.'" *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015) (quoting *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (holding that "induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement")).

The Complaint does not allege that SkySail knew that some induced act constituted patent infringement.  The Complaint does not allege who was induced or what action was induced.[24] The reference to induced infringement is not developed or set out in a separate count.

---

[23] This case does not require (and therefore does not allow) the Court to issue any advisory opinion on claims other than Claim 1 of the '920 Patent.

[24] The Complaint does mention that SkySail won a bid to provide services for the state of New Hampshire.  (Doc. No. 1 ¶ 28.)  However, the Complaint does not allege that New Hampshire used SkySail software or otherwise used Truveris patented processes.

To the extent the Complaint could be read to include a claim for induced infringement, such claim is dismissed.

### III.    Contributory Infringement

The Complaint alleges:  "On information and belief, SkySail … contributes to the infringement of at least claim 1 of the '920 Patent…."  (Doc. No. 1 ¶ 30.)

"Contributory infringement occurs if a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party to be especially made or especially adapted for use in an infringement of such patent."  *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012).  "Under the plain language of the statute, a person who provides a service that assists another in committing patent infringement may be subject to liability under section 271(b) for active inducement of infringement, but not under section 271(c) for contributory infringement."  *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1357 (Fed. Cir. 2007); *see also Cleveland Clinic Found. v. True Health Diagnostics, LLC*, No. 1:15 CV 2331, 2016 WL 705244, at *7-8 (N.D. Ohio Feb. 23, 2016), *aff'd,* 859 F.3d 1352 (Fed. Cir. 2017)

"Like induced infringement, contributory infringement requires knowledge of the patent in suit and knowledge of patent infringement."  *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015); *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 488 (1964).

The Complaint does not allege that SkySail knew that some act (to which SkySail contributed) constituted patent infringement.  The Complaint does not allege who, if anyone,

committed acts of infringement to which SkySail contributed.[25]  The reference to contributory infringement is not developed or set out in a separate count.

To the extent the Complaint could be read to include a claim for contributory infringement, such claim is dismissed.

## <u>Conclusion</u>

For the reasons set forth above, SkySail's motion to dismiss, (Doc. No. 13), is GRANTED. This case is hereby dismissed.

**IT IS SO ORDERED**.

Date: September 28, 2022

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

---

[25] The Complaint does mention that SkySail won a bid to provide services for the state of New Hampshire.  (Doc. No. 1 ¶ 28.)  However, the Complaint does not allege that New Hampshire used Truveris' software or patented processes.